Alfred **HUTT** and **H. Lee Hutt**, Plaintiffs,

v.

**DEAN WITTER REYNOLDS, INC.** and **James E. Vinick**, Defendants.

**Civ. A. No. 87–0138–F.**

United States District Court, D. Massachusetts.

May 10, 1990.

Robert Aronson, Springfield, Mass., for plaintiffs.

Gerald F. Rath, Bingham, Dana & Gould, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

FREEDMAN, Chief Judge.

### I. INTRODUCTION

Before the Court are the objections of the plaintiffs, Alfred and H. Lee Hutt ("the Hutts") to a January 9, 1990 Report and Recommendation by United States Magistrate Michael A. Ponsor, in which he recommended that summary judgment be entered against the plaintiffs on virtually all aspects of their suit. The Hutts' objections are opposed by the defendants, Dean Witter Reynolds, Inc. ("Dean Witter") and James Vinick ("Vinick"), who in turn object to the fact that the Magistrate did not recommend summary judgment as to *every* aspect of the plaintiffs' case. As will be seen, this case presents a novel issue of law untouched by other jurisdictions.

### II. DISCUSSION

*A. Relevant Facts*

The Court will briefly summarize the facts as found by the Magistrate. *See Hutt v. Dean Witter Reynolds, Inc.*, C.A. No. 87–0138–F, slip op. at 2–4 (D. Mass. January 9, 1990). Neither party makes any objection to these factual findings.

In December 1983, Alfred Hutt opened a securities account with Dean Witter. The account was under the supervision of the defendant Vinick. Three months later, Alfred and Lee Hutt opened a joint account with Dean Witter, again using Vinick as account executive. *Hutt,* slip op. at 2.

The first activity pertinent to this lawsuit occurred on February 16, 1984, when Vinick recommended and executed a purchase of 500 shares of "Safecard" stock for Alfred Hutt's individual account. *Id.* Another 1,000 shares were added to the ac-

count on January 18, 1985. *Id.* at 2–3. As the result of a stock dividend, Alfred Hutt's account received an additional 750 shares on April 22, 1985. *Id.* at 3.

Shortly thereafter, on June 17, 1985, Vinick suggested that "Safecard" stock be purchased for the plaintiffs' joint account. An order for 1,550 shares was executed. *Id.* A subsequent stock dividend added 310 shares to joint account and 450 shares to the individual account on October 31, 1985. *Id.*

On or about November 1, 1985, the plaintiffs requested that the securities in both accounts be transferred to another broker-dealer. At the time this request was made, the individual account contained 2,700 shares and the joint account 1,860 shares of "Safecard" stock. *Id.*

Vinick did not promptly comply with the plaintiffs' transfer request. Instead, on November 12, 1985, he called Alfred Hutt and suggested that the price of "Safecard" had leveled off, and was likely to decline. He advised the plaintiffs to sell and take their profits. *Id.* The plaintiffs assert that at the same time, Vinick informed them that he was telling all of his customers to sell their "Safecard," a representation which they now claim to be false. Plaintiffs' Complaint at 3, ¶ 10(b); *Hutt,* slip op. at 3. The Hutts also suggest that at the time Vinick made his recommendation, both he and Dean Witter failed to inform them that each defendant would receive a commission or mark-up based on the sale of the stock. Plaintiffs' Complaint at 3, ¶ 10(c); *Hutt,* slip op. at 3.

Accepting Vinick's recommendation, the plaintiffs authorized the sale of the stock from both of their accounts. The sale took place on November 19, 1985, and netted the plaintiffs a total of $41,748.75. Although precise figures are not before the Court, it appears that the value of the "Safecard" stock rose significantly in the months following the plaintiffs' sale. *Hutt,* slip op. at 4. The Hutts' accounts with Dean Witter were closed and transferred at the end of the same month. *Hutt,* slip op. at 3–4.

Complicating matters is the nature of the securities involved. The "Safecard" stock was traded in the Over–the–Counter ("OTC") market, the national market specializing in smaller or less well-established companies. Because of the small volume of shares often involved in OTC transactions, brokerage houses serve as so-called "market makers" for different stocks. A "market maker" is defined by the 1934 Securities and Exchange Act as:

> any specialist permitted to act as a dealer, any dealer acting in the capacity of block, and any dealer who, with respect to a security, holds himself out (by entering quotations in an inter-dealer communications system or otherwise) as being willing to buy and sell such security for his own account on a regular or continuous basis.

15 U.S.C.S. § 78c(a)(38) (1983).

The record reveals that Dean Witter was a market maker for the "Safecard" stocks. When the Hutts sold their "Safecard" stock, Dean Witter purchased the stock in its role as market maker. The record does not indicate what exactly happened to the stock after it was purchased by Dean Witter. *Hutt,* slip op. at 4. The plaintiffs allege that "Dean Witter and Vinick received a commission or mark-up in connection with the sale of the Safecard shares in the Individual Account and in the Joint Account." Plaintiffs' Complaint at 4, ¶ 15. However, Arnold Wolter ("Wolter"), Dean Witter Senior Vice President (OTC Trading Department), stated in an affidavit that "Dean Witter holds shares as a market maker solely for liquidity purposes, and not for investment purposes...." Affidavit of Alfred Wolter at 4, appended to Defendants' Supplemental Memorandum of Law in Support of Motion to Dismiss or, in the Alternative, for Summary Judgment. Wolter further averred that Dean Witter earns money as a market maker by buying shares at a "bid" price and reselling the same shares at the "asked" price. *Id.*

The plaintiffs' complaint originally asserted eight counts, four of which the parties have subsequently agreed to dismiss. Only one of the four remaining claims is based on federal law; Count One asserts that the defendants violated Section 10(b)

of the Securities and Exchange Act of 1934, including the rules and regulations promulgated thereunder. The remaining counts (Three, Five and Seven) respectively assert pendant state law causes of action for common law fraud, negligence and breach of contract. *Hutt*, slip op. at 4.

Magistrate Ponsor ruled that only the plaintiffs' claim that Dean Witter and/or Vinick actually profited themselves from the purchase and resale of the "Safecard" stock comes within the ambit of that rule. As to the remainder, Magistrate Ponsor recommended that summary judgment be entered, reasoning that the calculation of potential profits had the Hutts kept the stock would be unduly speculative. *Id.* at 12.

### B. Statutory Authority

Section 10(b) of the Securities and Exchange Act of 1934 ("the 1934 Act") states in relevant part as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails ...

(b) to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C.S. § 78j (1983). Section 10(b) has been supplemented by well-known rules promulgated by the Securities and Exchange Commission, perhaps the most famous of which is Rule 10b–5:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails ...

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1989).

The plaintiffs argue that by advising them to sell their "Safecard" stock when they did (sooner, they claim now, than they would have otherwise), the defendants violated both of the above-cited provisions. As a result, the Hutts claim that they are entitled to recover reasonable unrealized profits pursuant to the provisions of Section 28(a) of the 1934 Act, which states in relevant part as follows:

The rights and remedies provided by this title shall be in addition to all other rights and remedies that may exist at law or in equity; but no person permitted to maintain a suit for damages under the provisions of this title shall recover ... a total amount in excess of his *actual damages* on account of the act complained of.

15 U.S.C.S. § 78bb(a) (1983) (emphasis added).

The defendants assert that since the Hutts actually made a profit on the sale of their stock, they are unable as a matter of law to show "actual damages." The plaintiffs respond by claiming that defrauded sellers are entitled to their lost potential profits under the 1934 Act, or are entitled to recover any benefit enjoyed by the defendants.

### C. Analysis

1. "Actual Damages" Must Not Be Speculative

a. *Case Law*

The sole issue before the Court with respect to the Hutts is whether or not they can show that they have suffered "actual damages." Unfortunately, resolving this matter is complicated by the fact that "[i]n enacting § 28(a) [15 U.S.C. § 78bb(a) ], Congress did not specify what was meant by 'actual damages.'" *Randall v. Loftsgaarden*, 478 U.S. 647, 662, 106 S.Ct. 3143, 3152,

92 L.Ed.2d 525 (1986). As the Fifth Circuit Court of Appeals once commented, "[t]he proper measure of actual damages recoverable by the Rule 10b–5 plaintiff is 'the least formulated and the least reported upon' of all issues raised by a 10b–5 claim." *Huddleston v. Herman & MacLean*, 640 F.2d 534, 554 (5th Cir.1981), *citing* Jacobs, *The Measure of Damages in Rule 10b–5 Cases*, 65 Geo. L.J. 1093, 1095 (1977).

In making a determination in this case, the Court is aided by the earlier opinion written by Magistrate Ponsor. After a thorough review of applicable case law, Magistrate Ponsor distilled the following rule with respect to actual damages:

> In a defrauded seller case, the measure of damages is the difference between what the seller received and the fair market value of the securities as of the date of the sale, unless the entity committing the fraud has profited to a greater extent, in which case the measure of damages is the evil-doer's profit, or unless the factual context provides the factfinder with some other non-speculative basis for computing damages.

*Hutt*, slip op. at 11.

The plaintiffs take issue with Magistrate Ponsor's finding that prospective profits are only recoverable to the extent that they are actually enjoyed by the evil-doer. Relying in large part on *Janigan v. Taylor*, 344 F.2d 781 (1st Cir.), *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965), the Hutts argue that reasonable potential profits are a permissible species of actual damages whenever an investor misses out on them due to fraud, regardless of who actually enjoys the profits. The Magistrate agreed that certain language could be extracted from various cases to support the Hutts' contention, but found that when the facts of the same cases are examined, the quoted material takes on a more limited meaning. *See Hutt* at 11.

In *Janigan*, for instance, a group of former stockholders brought suit against Taylor, the president of the Boston Electro Steel Casting company, alleging that Tay-

lor made material misrepresentations upon which they relied.[1] *Id.* at 783. Based on those misrepresentations, the plaintiffs in 1956 sold their shares to the defendant for $40,000. Taylor resold the stock approximately two years later for $700,000. *Id.*

While discussing the plaintiffs' claims for damages, the *Janigan* court distinguished between defrauded buyers and defrauded sellers. *Id.* at 786. A defrauded *buyer*, the Appeals Court said, may recover the difference between the actual value of an item purchased and the price paid, as well as outlays directly attributable to the defendant's conduct, *id.* at 786, "but not damages covering 'the expected fruits of an unrealized speculation.'" *Id.*, *citing Sigafus v. Porter*, 179 U.S. 116, 125, 21 S.Ct. 34, 37, 45 L.Ed. 113 (1900).

Where the victim is a defrauded *seller* who has sold directly to the tortfeasor, the First Circuit concluded that another factor must be considered:

> if the property is not bought from, but sold to the fraudulent party, future accretions not foreseeable at the time of the transfer even on the true facts, and hence speculative, are subject to another factor, *viz.*, that they accrued to the fraudulent party. It may, as in the case at bar, be entirely speculative whether, had plaintiffs not sold, the series of fortunate occurrences would have happened in the same way, and to their same profit. However, there can be no speculation that the defendant actually made the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud, whether foreseeable or not. It is more appropriate to give the defrauded party the benefit even of windfalls then to let the fraudulent party keep them.

*Janigan*, 344 F.2d at 786, *citing Marcus v. Otis*, 168 F.2d 649, 660 (2d Cir.1948). As the Magistrate points out, the clear inference of the *Janigan* decision is that prospective profits are speculative (and hence unrecoverable) *unless* a plaintiff can show

---

**1.** The trial court found that the defendant concealed information which indicated that the

company's profitability was on the rise even at the time of the sale. *Janigan*, 344 F.2d at 785.

that the defendant himself enjoyed the profits as a proximate result of his fraud. *Hutt,* slip op. at 9.

Likewise, in *Baumel v. Rosen,* 283 F.Supp. 128 (D.Md.1968), *aff'd in part and reversed in part,* 412 F.2d 571 (4th Cir. 1969), *cert. denied,* 396 U.S. 1037, 90 S.Ct. 681, 24 L.Ed.2d 681 (1970), the Maryland district court held that *Janigan,* "broadly read, ... stands for the proposition that ... where there has been an appreciation in value since the time that he was fraudulently induced to part with his securities, the defrauded seller may resort to a rule of damages or form of relief to recover future profits that he was caused to lose." *Id.* at 145. Again, however, this Court must take notice of the fact that *Baumel,* at base, involved an action by plaintiff sellers against defendant buyers. This factual limitation was implicitly recognized by the Maryland district court itself: " 'The injured party is entitled to require the *perpetrator* to disgorge gains made at the expense of the injured.' " *Id., quoting Speed v. Transamerica Corp.,* 135 F.Supp. 176, 186 (D.Del.1955), *aff'd on other grounds,* 235 F.2d 369 (3rd Cir.1956) (emphasis added).

The Magistrate's reading of *Janigan* is supported by the use made of it by the Supreme Court, including one decision relied on by the plaintiffs themselves. For instance, in 1972 *Janigan* served as a partial basis of the Supreme Court's declaration of the proper measure of actual damages under 15 U.S.C. § 78bb(a):

> In our view, the correct measure of damages under § 28 of the Act, 15 U.S.C. § 78bb(a), is the difference between the fair value of all that the ... seller received and the fair value of what he would have received had there been no fraudulent conduct, ... except for the situation where the *defendant* received more than the seller's actual loss. In the latter case damages are the amount of the defendant's profit. See *Janigan v. Taylor,* 344 F.2d 781, 786 ( [1st Cir.] 1965), [*cert. denied* ], 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965).

*Affiliated Ute Citizens v. United States,* 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972) (emphasis added) (citations omitted); *see also Loftsgaarden,* 478 U.S. at 663, 106 S.Ct. at 3153 (citing *Janigan* in support of the proposition that "actual damages" under 15 U.S.C. § 78bb(a) include a defendant *buyer's* profit in excess of plaintiff seller's loss).

In addition, while there have been other circuit courts which have relied on the principles espoused by *Janigan,* none have indicated a willingness to extend those principles as far as the plaintiffs suggest that this Court should. *See, e.g., Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1139 (5th Cir.1988) (court will award plaintiff's actual losses or defendant's unjust enrichment, but never both); *Wilson v. Great American Industries, Inc.,* 855 F.2d 987, 996 (2d Cir.1988) (defendants liable for loss of benefit of corporate merger to defrauded plaintiffs); *Pidcock v. Sunnyland America, Inc.,* 854 F.2d 443, 446–48 (11th Cir.1988) (discussing various applications of *Janigan* principles); *Rowe v. Maremont Corp.,* 850 F.2d 1226, 1241 (7th Cir.1988); *Nelson v. Serwold,* 687 F.2d 278, 281 (9th Cir.1982) (under certain circumstances, seller may recover an amount equal to purchaser's profits); *Nickels v. Koehler Management Corp.,* 541 F.2d 611, 617–18 (6th Cir.1976) (comparing federal and Ohio securities law); *Harris v. American Investment Co.,* 523 F.2d 220, 224–26 (8th Cir.1975) (discussing various means of calculating damages); *Myzel v. Fields,* 386 F.2d 718, 748–49 (8th Cir.1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968) (allowing recovery of unrealized profits "where the jury finds that with full disclosure [the plaintiff] would have retained [the stock] until the higher price *gained by the wrongdoer* was reached.") (emphasis added).

One of the cases particularly relied upon by the Hutts merits more detailed discussion. In *Dupuy v. Dupuy,* 551 F.2d 1005 (5th Cir.1977), a dispute arose between two brothers over the value of some stock sold by one to the other. After finding that the purchasing brother omitted and misrepresented information to the selling brother in order to artificially depress the price, a jury

awarded the defrauded brother $905,000. The 5th Circuit held that the district court had correctly instructed the jury on the matter of damages, writing specifically that:

> [t]he jury may consider whether the plaintiff would have held onto his stock absent the misinformation. If the jury decides he would not have consummated the sale, it may then award the difference between the sale price and the value of the stock at a reasonable time in the future.... Applied to a defrauded seller, this theory would allow a jury to consider the value the stock attained within a reasonable time after the sale.

*Dupuy*, 551 F.2d at 1025.

█ The Fifth Circuit's language, particularly the final sentence, is obviously very favorable to the plaintiffs' point of view in this case. However, *Dupuy*, as does every other case examined by this Court, involves the liability of a defendant buyer for future accretions or profits enjoyed by the buyer himself. The short and simple truth of the matter is that if the alleged fraud of the defendant has not resulted in any benefit to the defendant, then calculation of the potential profits the plaintiff would have enjoyed absent the defendant's actions is too speculative to permit recovery.

This Court's conclusion is supported by the Second Circuit's decision in *Levine v. Seilon, Inc.*, 439 F.2d 328 (2d Cir.1971). Levine, a preferred stockholder of Seilon, brought suit against Seilon alleging violations of Rule 10b–5 when Seilon failed to go through with a proposed exchange of common for preferred stock. Instead, Levine charged, the defendant's real intention was to redeem the preferred stock for its call price, which it did in the spring of 1969. *Id.* at 330. Levine argued that he was fraudulently induced to hold onto his preferred stock in anticipation of the exchange for common, and as a result missed out on the opportunity to sell his preferred stock on the open market during the summer of 1968 for an amount in excess of the call price subsequently paid by Seilon. *Id.* at 331–32.

The Second Circuit decided that Levine was not entitled to recover damages under the 1934 Act. Relying on *Janigan, supra*, the court recognized that under certain circumstances, a defrauded seller could require a wrongdoer to " 'disgorge his fraudulent enrichment.' " *Levine*, 439 F.2d at 334, *quoting Janigan*, 344 F.2d at 786. However, the Second Circuit found that "... Seilon obtained no 'enrichment' and fell heir to no 'windfall' by redeeming the preferred shares at their call price; everything indicates the preferred stockholders got all that the stock was worth...." *Levine*, 439 F.2d at 334. In a finding fully applicable to the instant case, the Second Circuit wrote: "... Levine lost nothing from Seilon's alleged fraud except the euphoria he doubtless experienced during the summer and fall of 1968." *Id.* at 335.

█ Based on the evidence now before the Court, it would appear that the Hutts are in the same position as Levine. Paid a fair and honest price for the stock at the time they sold it, their only "loss" was the dismay they felt when the "Safecard" stock continued to rise in price after the sale. That type of loss, however painful, is one which the Court is certain Congress did not intend to bring within the ambit of the 1934 Act. To hold otherwise would be to require that brokerage houses act as insurers of investors' fortunes, and guarantors of only good results. Even Lloyds of London would demur at offering such a policy.

#### b. *Restatement of Restitution*

If further authority is needed to underscore this point, the plaintiffs have graciously provided it themselves. As they point out, relevant language is contained in the *Restatement of Restitution* § 151 (1937), which states as follows:

> Where a person is entitled to a money judgment against another because by fraud, duress or other consciously tortious conduct *the other has acquired, retained or disposed of his property*, the measure of recovery for the benefit received by the other is the value of the property at the time of its improper acquisition, retention or disposition, or a

higher value if this is required to avoid injustice where the property has fluctuated in value or conditions have been made to it.

(Emphasis added.) As the drafters of section 151 explain in comment c, the section may be applied to items of fluctuating value:

> Where the subject matter is of fluctuating value, and where the person deprived of it might have secured a higher amount for it had he not been so deprived, justice to him may require that the measure of recovery be more than the value at the time of deprivation. *This is true where the recipient knowingly deprived the owner of his property or where a fiduciary in violation of his duty used the property of the beneficiary for his own benefit.* In such cases the person deprived is entitled to be put in substantially the position in which he would have been had there not been the deprivation, and this may result in granting to him an amount equal to the highest value reached by the subject matter within a reasonable time after the tortious conduct. This is done if he can prove that he probably would have made a sale while the subject matter was at its highest point in value.

(Emphasis added.) As the comment makes perfectly clear, the type of recovery requested by the plaintiffs is only available in those instances where the fraud has resulted in benefit to the tortfeasor. Absent such a showing, there is no cognizable grounds for a reasonable calculation of damages.

### 2. The Possibility of Some Liability Still Exists

Having concluded that the plaintiffs may only show actual damages if they can prove that either Dean Witter or Vinick profited from the allegedly fraudulently sell recommendation which Vinick made to the Hutts, the Court now turns to the question of whether or not the Hutts have brought forth enough information to survive the defendants' motion for summary judgment.

As was noted earlier, the defendants have submitted an affidavit from Arnold Wolter, Dean Witter Senior Vice President (OTC Trading Department), in which he emphatically states that while Dean Witter did purchase the plaintiffs' stock, it did so solely as a "market maker," and not as a corporate investment. Magistrate Ponsor acknowledged Wolter's affidavit, but also noted that the record did suggest that occasionally, a mark-up might occur which would result in direct profit to the market maker. *Hutt*, slip op. at 4. In light of that fact, and in light of the fact that no evidence had been presented as to precisely what happened to the stock following Dean Witter's purchase, the Magistrate concluded that further discovery would be permitted to show whether or not the defendants themselves enjoyed any profit from the sale of the stock. *Id.* at 13.

As the Magistrate's conclusion is both sensible and entirely consistent with the law in this area, the Court concurs. Further discovery may take place in an effort to determine precisely what happened to the Hutts' stock following its sale, and what profits, if any, were made by the defendants. The defendants' objections to the Magistrate's Report and Recommendation are overruled.

### 3. The Defendants Did Not Mishandle the Plaintiffs' Account

In a supplementary pleading, the Hutts proffer various citations purporting to show that a plaintiff may recover "the difference between the price which the seller received from the defrauding purchaser and the price which the seller would have received if the securities had been sold within a reasonable period of time after the fraudulent purchase." Plaintiffs' *Supplemental* Objections to Report and Recommendation Regarding Defendants' Motion to Dismiss or for Summary Judgment at 1.

The Court has examined the cited authorities and finds them less helpful than those contained in the plaintiffs' main brief. The fundamental problem with the cases cited is that they deal with instances in which a broker or agent mishandled a plaintiff's

account. For instance, in *Letson v. Dean Witter Reynolds, Inc.*, 532 F.Supp. 500 (N.D.Cal.1982), the defendant allegedly liquidated the plaintiffs' commodities futures trading accounts without giving the plaintiffs a chance to meet a margin call. Assuming the liquidation was wrongful, the district court agreed that the plaintiffs were entitled to recover "the additional amount required to repurchase the same contracts in the market with a reasonable time after liquidation.... That amount is measured by the difference between the contracts' liquidation prices and the highest intermediate prices reached by the identical contracts during a reasonable period after the wrongful sale." *Letson*, 532 F.Supp. at 503 (citations omitted).

A similar liquidation occurred in *Schultz v. Commodity Futures Trading Com'n*, 716 F.2d 136 (2d Cir.1983). The Second Circuit, relying on *Gallagher v. Jones*, 129 U.S. 193, 9 S.Ct. 335, 32 L.Ed. 658 (1889), agreed that when a party is injured by a wrongful sale, conversion or failure to purchase an item of fluctuating value, "it is necessary when assessing damages ... to include profits possibly lost as a result of the wrongful conduct." *Schultz*, 716 F.2d at 140.

The problem facing the plaintiffs (and unaddressed in their brief) is that these cases are factually inapposite from the present situation. Specifically, the Hutts do not contend that Vinick or Dean Witter failed to carry out instructions given them, or acted unilaterally without notifying them. To the contrary, the plaintiffs admit that they issued the order to sell the "Safecard" stock, and that Vinick carried out their instructions.

Therefore, the materials contained in the plaintiffs' supplemental memorandum is not controlling in this instance.

### III. CONCLUSION

For the reasons set forth above, the plaintiffs' objections to the Magistrate's Report and Recommendation are OVERRULED. Likewise, the defendants' objections are OVERRULED. The Court hereby ADOPTS the recommendation of the Magistrate that Counts Two, Four, Five, and Six be DISMISSED with prejudice. Counts One, Three, Seven, and Eight are DISMISSED in part, subject to further discovery.

It is So Ordered.