**Warren C. RUDINGER**

v.

**INSURANCE DATA PROCESSING, INC. and Peter D. Carlino.**

**Civ. A. No. 90–2871.**

United States District Court, E.D. Pennsylvania.

Nov. 19, 1991.

Barbara Anisko, Christopher Momjian, Gerald E. Burns, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for plaintiff.

Carl T. Bogus, Noreen Walsh, Jeffrey Cooper, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

DITTER, District Judge.

In this action, plaintiff alleges violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j; Securities Exchange Commission Rule 10b–5, 17 C.F.R. 240.10b–5; and Pennsylvania law. Defendants move for summary judgment contending: 1) plaintiff has failed to show the requisite scienter for a securities fraud claim; 2) plaintiff lacks standing under 10b–5 since he neither purchased nor sold securities; and 3) plaintiff alleges no "actual damages," to which 15 U.S.C. § 78bb(a) limits recovery. I will deny defendants' motion for summary judgment.

## I. BACKGROUND

In July, 1988, Warren C. Rudinger applied to become president and chief operating officer of Insurance Data Processing, Inc. ("IDP"). He met and interviewed with defendant, Peter D. Carlino, who is IDP's owner and majority shareholder, and with other IDP personnel. In December, 1988, Rudinger signed an employment contract with IDP. This contract assured him a base salary of $100,000 per year, a bonus of five percent of IDP's pre-tax income, and substantial benefits. The agreement also provided:

> *Stock Options:* We will establish a stock option or stock purchase plan providing that you will be permitted to purchase up to 10% of IDP's stock using a value for IDP of $10 million. In addition, if it can be accomplished, you [Rudinger] will be given the opportunity to convert a portion of any annual cash bonus earned by you to a stock bonus.

Rudinger worked at IDP for sixteen months. From the outset, he claims, Carlino and other IDP personnel hampered his efforts to improve the company. They also ignored his attempts to establish the stock option. In April, 1990, IDP fired him. Rudinger now demands his unpaid salary, bonuses, severance pay, and other undelivered benefits. In addition, Rudinger accuses defendants of violating § 10(b) of the Securities Exchange Act and rule 10b–5[1] by materially misrepresenting IDP "in connection with" the offer of the stock purchase plan. He claims defendants' misrepresentations concerned the following issues:

1) **The value of the company.** Although Carlino offered him "up to 10% of IDP's stock using a value for IDP of $10 million," Carlino actually knew IDP's value was going down, not up.

2) **Plans to sell IDP.** Carlino allegedly told Rudinger he was not interested in selling IDP, and that he was preparing to take the company public. In fact, Carlino had no plans to go public and had been negotiating seriously with a private buyer throughout 1988.

3) **IDP's 1988 losses.** In September, 1988, IDP personnel allegedly showed Rudinger an undated, one-page income

---

**1.** Rule 10b–5 states "it shall be unlawful for any person ... to make any untrue statement of a material fact ... in connection with the purchase or sale of any security."

summary for IDP recording year-to-date losses of about $700,000, which Rudinger was led to believe was current. In fact the statement only reported losses through June.

4) **Rudinger's proposed authority and holdings at IDP.** Carlino allegedly promised Rudinger complete operating control at IDP as well as his 10% stock option, but never intended to deliver either one.

These misrepresentations, Rudinger claims, induced him to turn down another profitable job where he could have held the kind of authority and equity he sought. While negotiating with IDP in the fall of 1988, Rudinger was also negotiating with Computer Aided Programming ("CAP"), a Michigan company. In October, CAP had offered Rudinger a base salary of $95,000 per year, a bonus of up to five percent of CAP's pre-tax profits, benefits, and an option to buy up to ten percent of CAP stock at net book value. It was from this CAP offer that Rudinger negotiated the terms of employment with IDP.

In November, while Rudinger was still negotiating, CAP signed a letter of intent with McGraw–Hill, Inc., under which McGraw–Hill would buy forty percent of the outstanding shares of capital stock in CAP in January, 1989. The purchase price would be $2,000,000, representing a per share price of approximately $42.94. McGraw–Hill would then have an option to buy the remaining sixty percent of CAP for at least $3,000,000 ($46.00 per share), within the next three years. CAP's chief executive officer told Rudinger he could participate in these deals if he accepted the offer and exercised his option right away. He also warned him, however, that if all of CAP were sold, he could not guarantee Rudinger's job.

Rudinger chose IDP's seemingly better offer. The CAP–McGraw–Hill transactions took place as planned. Rudinger now contends that had he not been deceived about IDP's value, he would have worked for CAP at least one year and participated in the CAP–McGraw–Hill transactions. In 1988 he claims he would have bought, as planned, 5,000 shares of CAP stock for $53,650. In January, 1989 he would have sold forty percent, or 2,000 shares, to McGraw–Hill for $85,880. In 1990, he would have sold his remaining 3,000 shares for $140,970. These transactions would have given him a profit of $173,200, which he now seeks to recover under the federal securities laws.

## II. ANALYSIS

### A. Scienter

■ Defendants first contend Rudinger fails to show scienter, a necessary element in any § 10(b) or rule 10b–5 claim.[2] Defendants explain that to show scienter, a plaintiff must establish the defendant's intent to deceive, manipulate, or defraud. Negligent conduct alone, whether gross, grave, or inexcusable, does not suffice. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 1381, n. 12, 47 L.Ed.2d 668, *reh. denied,* 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976).

Defendants insist Rudinger's own testimony shows they lacked that "willful intent to deceive." Rudinger acknowledges Carlino just "tried to represent the company in its most favorable light," and that Carlino only expressed an *opinion,* not a fact, that IDP was worth $10,000,000. (Defendants base their opinion argument on Rudinger's testimony that Carlino "basically said it was his feeling that the organization was worth at least that amount," and

**2.** Defendants also state Rudinger fails to establish materiality, but they merge this argument with scienter. Materiality is a mixed question of law and fact, to be resolved on summary judgment only when reasonable minds could not differ as to the importance of the misrepresentations. *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Materiality is defined as:

[A] substantial likelihood that the disclosure of the [truth] would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Id.*

I think the misrepresentations allegedly presented to Rudinger are not so clearly *immaterial* as to warrant summary judgment in defendants' favor.

that Carlino "thought the company was worth about ten million dollars.")

This argument does not save the defendants. In this circuit, scienter includes recklessness. *See Eisenberg v. Gagnon* 766 F.2d 770 (3d Cir.1985), *cert. denied* sub. nom. *Wasserstrom v. Eisenberg,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290.[3] In the specific context of a projection, forecast, or opinion, a plaintiff demonstrates scienter by showing the speaker communicated with "reckless disregard for its truth or falsity" or with lack of a "genuine belief that the information disclosed was accurate and complete in all material respects." *Id.* at 776; *Gilmore v. Berg,* 761 F.Supp. 358, 371 (D.N.J.1991).

Rudinger presents sufficient evidence that Carlino lacked a "genuine belief" in the information he disclosed. Although Carlino offered him a stock option "using a value for IDP of $10 million," apparently implying the company would be worth even more, Carlino has also stated since that even then, he believed IDP was worthless: "How could [IDP] be worth $10,000,000 when we are a bankrupt company?" "I'm not so dumb as to say a bankrupt company is worth ten million." Since Rudinger has sufficiently shown that Carlino may have been reckless, at the very least, defendants' motion for summary judgment on the absence of scienter must fail.[4]

**B. The Purchaser or Seller Requirement**

■ Defendants also claim Rudinger lacks standing under § 10(b). In *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) *reh. denied* 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 114, the Supreme Court held that only a purchaser or seller of securities may bring a 10b–5 action.[5] After reviewing the history of § 10(b), the Court concluded Congress did not mean to extend its protection against fraud "in connection with the purchase or sale of any security" to plaintiffs harmed "in connection with any *attempt* to purchase or sell a security." *See id.* 95 S.Ct. at 1924. Therefore, plaintiffs who claim they "would have" bought or sold stock, but for the alleged fraud, are not protected by § 10(b) of the Act. Here, defendants contend that since Rudinger never actually purchased IDP stock, he, too, lacks standing to sue.

Defendants construe the requirements of a "purchase" too narrowly. True, Rudinger never spent money on IDP stock. But an integral part of his contract with IDP promised him a "stock option or stock purchase plan." Realistically that agreement amounted to Carlino's representation that IDP's stock was worth $10 million and had growth possibilities. It is hardly a defense now to say Rudinger should have no remedy because he learned, soon after, that the stock was worth far less, or had no possibilities to increase in value, or both.

■ An agreement exchanging a plaintiff's services for a defendant corporation's stock constitutes a "sale" under the terms

---

**3.** The first Third Circuit case to adopt recklessness as the scienter standard was *McLean v. Alexander,* 599 F.2d 1190, 1197 (3d Cir.1979). That court defined recklessness in the context of omissions and misstatements as:

highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it. *Id.* at 1197.

**4.** In their supplemental pleading, defendants quote Professor Kevin R. Johnson's suggestion that a speaker's "recklessness" be measured by whether or not he stood to profit from his misrepresentation. If he did not, it is more

likely he spoke negligently than recklessly. Defendants argue here that since Carlino would not profit from Rudinger's misunderstanding, the court should not presume recklessness or scienter. This argument is misplaced in a summary judgment motion. Defendants' own quotation recommends the profit consideration to the *factfinder,* not to a court resolving disputes as a matter of law.

**5.** In *Blue Chip Stamps,* the offerees of the Blue Chip Stamps corporation's reorganization plan charged the company with issuing a materially misleading prospectus to discourage them from buying Blue Chip at a bargain price. The Court held they lacked standing since the fraud was not in connection with an actual purchase or sale of Blue Chip stock.

of the Securities Exchange Act. *Sanzone v. Phoenix Technologies,* 1990 WL 50732, p. 14, 1990 U.S.Dist. LEXIS 4656, p. 13 (E.D.Pa. April 19, 1990) [6]. *See also Collins v. Rukin,* 342 F.Supp. 1282, 1288 (D.Mass. 1972). For purposes of § 10(b), the distinction between the transfer of stock and of stock options is immaterial. *Yoder v. Orthomolecular Nutrition Institute, Inc.,* 751 F.2d 555, 559 (2d Cir.1985). Moreover, the exchange of securities need not be completed to constitute a sale. *See, e.g. Marine Bank v. Weaver,* 455 U.S. 551, 102 S.Ct. 1220, 1222 n. 2, 71 L.Ed.2d 409 (1982) ("A pledge of stock is equivalent to a sale for purposes of the antifraud provisions of the federal securities laws"); *Yoder, supra,* at 559 ("a contract for the issuance of transfer of a security may qualify as a sale under the securities laws even if the contract is never fully performed").[7]

■ Defendants alternatively argue they traded only a *promise* to create a stock option. They claim their transaction falls outside the Securities Act because they entered "nothing more than an agreement to agree."

Defendants' assertion is wrong. Rudinger claims he made it clear to Carlino that he was only interested in a job with IDP if he could obtain equity in the company. Defendants promised the stock option as the vehicle for him to do so. Just because the option's precise terms were not settled when Rudinger started work does not exempt that stock option promise from the restrictions of 10b–5.

■ Finally, defendants' position that Rudinger paid no consideration for his stock option is unfounded. Rudinger accepted an employment compensation package which included IDP's promise to create a stock option. By accepting this enforceable employment contract Rudinger "purchased" IDP securities, within the meaning of rule 10b–5, and has standing to bring this claim.

### C. "Actual Damages"

■ Defendants' third contention is that Rudinger's asserted damages, the profits he would have made at CAP, fall outside the "actual damages" limitation of 15 U.S.C. § 78bb(a).[8] They also argue his claimed damages while at IDP are not "actual damages" since, after he left IDP, he found a higher paying job which adequately compensated him for his losses.

Section 78bb(a) states that "no person permitted to maintain a suit for damages under the provisions of this chapter shall recover ... a total amount in excess of his actual damages on account of the act complained of." The Securities Exchange Act does not define "actual damages." The Supreme Court has held that under this limitation, the "correct measure of damages ... is the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct." *Randall v. Loftsgaarden,* 478 U.S. 647, 661, 106 S.Ct. 3143, 3152, 92 L.Ed.2d 525 (1986).

■ Defendants argue this measure necessarily limits Rudinger's recovery to out-of-pocket damages. That is not true. This circuit has held that in a 10b–5 action, plaintiffs may recover the "value of [their]

---

**6.** In *Sanzone,* the defendant corporation promised to pay Sanzone compensation in the form of five percent of the company's stock along with a cash salary and other benefits. Judge Green held the transfer of stock for services constituted a sale for purposes of securities fraud laws.

**7.** Defendants' effort to distinguish *Yoder* is unpersuasive. They contend Yoder's transfer of assets to defendant as consideration was indispensable to the court's conclusion that the exchange of her services for its promise of stock constituted a "sale." The court wrote explicitly, however, that while "this case does not require

us to hold that an action under rule 10b–5 can be maintained whenever sufficient allegations of fraudulent misrepresentations are made relating to stock where the plaintiff ... promises to work for a defendant in return for the latter's promise to issue stock, ... we see little reason for not holding to that effect." 751 F.2d at 561.

**8.** Rudinger notes correctly that although the Supreme Court used § 78bb to support its holding in *Blue Chip Stamps,* proof of "actual damages" is not a predicate to classifying a plaintiff as a purchaser or seller. It is a separate limitation on plaintiffs' recovery.

investment, [which] may include loss of a potential profit or benefit, in addition to the value of [their] investment, unless the loss is wholly speculative." *Gould v. American–Hawaiian S.S. Co.,* 535 F.2d 761, 781 (3d Cir.1976).[9] Moreover, once a plaintiff establishes damage from a lost opportunity, the defendant must bear the risk of its uncertain amount, *see id.* at 782. Otherwise, the Third Circuit reasoned, securities laws "could be violated with impunity in any situation in which the violation does not cause out of pocket loss." *Id.*[10]

Rudinger's "potential profits or benefits" are therefore recoverable, so long as they are not "wholly speculative." His profits are what he paid, minus what he would have paid had there been no fraudulent conduct. *Sharp, supra.* What Rudinger paid for his stock option was the cost of foregoing employment at CAP. *Surovcik v. D. & K. Optical, Inc.,* 702 F.Supp. 1171, 1178 (M.D.Pa.1988). What he would have paid, had there been no fraudulent conduct, is the $53,650 for CAP stock, since, as he claims, if he had known IDP's true value he would have declined IDP and chosen CAP instead.

[10] I find the profits Rudinger claims on CAP stock are not "wholly speculative." In fact, they are certain, fixed, and calculable to the penny.[11] In December, 1988, when Rudinger turned down CAP's offer, he already knew the price, quantity, and timing of each transaction with CAP and McGraw–Hill. Carlino, too, knew Rudinger's opportunities there and, allegedly, he fraudulently induced him to turn them down in favor of IDP.

"Wholly speculative" claims, as that term has been interpreted, are amorphous when compared to Rudinger's. In *Rubenstein v. IU Intern. Corp.,* 506 F.Supp. 311, 316 (E.D.Pa.1980), for example, Judge Pollak held that a shareholder's claim for unspecified losses resulting from a general reduction in company control were "too speculative" to permit recovery. In *Barr v. McGraw–Hill,* 710 F.Supp. 95, 98 (S.D.N.Y.1989), disappointed investors' claims for profits as measured by defendants' own exaggerated predictions were "impermissibly speculative."

Rudinger, on the other hand, claims the direct, foreseeable, and specific profits he

---

**9.** The holding of *Gould* came in the context of a claim under § 14(a) of the Securities Exchange Act. Likewise, for a 10b–5 claim, the Third Circuit has held that "the measure of damages is the difference between what the buyer paid for his stock and what he would have paid had there been no fraudulent conduct." *Sharp v. Coopers & Lybrand,* 649 F.2d 175 (3d Cir.1981), cert. denied, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982).

**10.** *Gould's* damage formulation stems directly from the *Blue Chip Stamps* Court's concern about limiting "vexatious litigation" of highly speculative claims. 95 S.Ct. at 1927. In that decision, the Court reasoned that like the "actual damages" limitation of 10b–5, a strict construction of the purchaser/seller requirement would help screen out plaintiffs who "would have" bought some successful stock "if only" defendants hadn't diverted their money. Would-be purchasers' claims were too unwieldy:

> While the damages suffered by purchasers and sellers pursuing a Sec. 10(b) cause of action may on occasion be difficult to ascertain, in the main such purchasers and sellers at least seek to base recovery on a demonstrable number of shares traded. In contrast, a putative plaintiff, who neither purchases nor sells securities but sues instead for intangible economic injury such as a loss of a non-

contractual opportunity to buy or sell, is more likely to be seeking largely conjectural and speculative recovery in which the number of shares involved will depend on the plaintiff's subjective hypothesis. *Id.* at 734–35.

Rudinger is hardly the kind of plaintiff *Blue Chip Stamps* meant to turn away. Unlike the barred putative plaintiffs, Rudinger seeks recovery on a "demonstrable number of shares," preset by CAP and McGraw–Hill and completely independent of his own "subjective hypothesis." He does not even fit the Court's description of barred plaintiffs: "potential purchasers of shares, either in a new offering or on the Nation's post-distribution trading markets, who allege that they decided not to purchase because of an unduly gloomy representation or the omission of favorable material...." 95 S.Ct. at 1926. Rudinger was an unemployed executive looking to run and obtain equity in a successful company. He had two offers, IDP's and CAP's. He negotiated IDP's contract on the basis of CAP's. It is not "largely conjectural" to say but for IDP's alleged misrepresentations Rudinger would have gone to CAP.

**11.** The fact that plaintiffs' loss could be determined with certainty was a key factor in justifying benefit-of-the-bargain damages in *Osofsky v. Zipf,* 645 F.2d 107, 114 (2d Cir.1981), a landmark case for this type of damage.

would have made if not for defendants' alleged fraud. Rudinger does not even ask defendants to bear a burden of uncertainty, as *Gould* would permit. His damages are more easily calculable than even the plaintiffs' in *Redstone v. Goldman Sachs*, 583 F.Supp. 74 (D.Mass.1984), where the court held that even though their portfolio had appreciated in the months since defendant's alleged securities violation, their asserted loss qualified as actual, nonspeculative damage. The court wrote:

> The plaintiffs allege that they instructed [defendant broker] to purchase a very specific class of securities, AA-grade municipal bonds. These bonds had a known yield. The defendants failed to make these purchases, and ultimately purchased lower yield securities in furtherance of their marketing purposes. The plaintiffs are therefore seeking realization of their reasonably certain expectations rather than "the expected fruits of an unrealized speculation." 583 F.Supp. at 76, quoting *Janigan v. Taylor*, 344 F.2d 781 (1st Cir.1965), *cert. denied* 382 U.S. 879, 86 S.Ct. 163 [15 L.Ed.2d 120] (1965).

Rudinger, too, seeks the realization of reasonably certain expectations: one pre-arranged purchase from CAP and two pre-arranged sales to McGraw–Hill.[12]

■ Of course, I am not saying these events would *necessarily* have happened as Rudinger describes. A jury may decide Rudinger never actually would have moved to Michigan. It may find he would have neglected to exercise his stock option at CAP, as he did at IDP. Maybe McGraw–Hill would have bought 40% of CAP but not including *Rudinger's* shares, in 1989. Maybe the second McGraw–Hill purchase was too speculative since McGraw–Hill was not bound to purchase until 1992, if at all. Juries weigh these uncertain questions all the time. All I hold is that it is neither "largely conjectural" nor "wholly speculative," as a matter of law, to seek damages based on certain, fixed, and demonstrable profits thwarted by a defendant's alleged fraud. Defendants' motion for summary judgment must be denied.

---

12. I am aware of the recent case *Hutt v. Dean Witter Reynolds, Inc.*, 737 F.Supp. 128 (D.Mass. 1990), which held that *all* prospective profits are speculative (and hence unrecoverable) unless a plaintiff can show the *defendant* enjoyed those profits as proximate result of his fraud. Such a harsh rule is unwarranted in this Circuit under *Gould.* Moreover, *Hutt* emphasizes a distinction between defrauded buyers and defrauded sellers, relying on the same model of hypothetical investors as *Blue Chip Stamps.* 737 F.Supp. at 131. Rudinger, however, made one, specific investment based on IDP's representations. Whether IDP directly profited is as yet unclear, but it certainly knew of Rudinger's potential loss.