USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ Nos. 96-1734 and 96-1735 HAROLD S. ANSIN, ET AL., Plaintiffs, Appellees, v. RIVER OAKS FURNITURE, INC., ET AL., Defendants, Appellants. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Richard G. Stearns, U.S. District Judge] ___________________ ____________________ Before Cyr, Boudin, and Lynch, Circuit Judges. ______________ ____________________ Edward P. Leibensberger, with whom John C. Fitzpatrick, Glenn E. _______________________ ___________________ _________ Deegan, and Nutter, McClennen & Fish, LLP were on brief, for ______ _________________________________ appellees. Ames Davis, with whom Nancy S. Jones and Waller Lansden Dortch & __________ _______________ _______________________ Davis were on brief, for appellants. _____ ____________________ February 3, 1997 ____________________ LYNCH, Circuit Judge. This case arises from a LYNCH, Circuit Judge. _____________ series of transactions among former fellow shareholders of a Mississippi close corporation, River Oaks Furniture, Inc. The Ansins,1 Massachusetts investors, allege that Thomas Keenum and Stephen Simons, officers and directors of River Oaks, fraudulently induced them to sell their shares in River Oaks ten months before a successful initial public offering ("IPO"). The Ansins also allege that Keenum and Simons violated the contractual terms of a stock subscription agreement and other corporate documents by causing an unauthorized transfer of a number of the Ansins' shares to other corporate insiders. The Ansins sued Keenum, Simons and River Oaks Furniture in federal court in Massachusetts, alleging securities law violations under Section 10(b) of the Securities Exchange Act of 1934, conversion, breach of contract, breach of fiduciary duty, common law fraud, legal malpractice and a violation of Mass. Gen. Laws ch. 93A.  The jury found for the plaintiffs on all counts then remaining in the case and awarded both compensatory and punitive damages. Defendants appeal from the judgment against them, arguing that they were entitled to judgment as a matter of law on all counts, that the action was barred  ____________________ 1. The plaintiffs in this action are Harold S. Ansin, Lawrence J. Ansin (by the executor of his estate), and the Ansin Foundation (a private charitable trust), collectively "the Ansins." -2- 2 because of laches and related doctrines, and that both the compensatory and punitive damages awards are legally unsustainable. The Ansins cross-appeal the pre-trial dismissal of their Mass. Gen. Laws ch. 93A claim, and also argue that the district judge improperly denied their request for prejudgment interest. They also ask this court to correct a clerical error in the judgment. I. When the losing party challenges the sufficiency of the evidence, as defendants do here, this court views the record in the light most favorable to the jury's verdict. See Correa v. Hospital San Francisco, 69 F.3d 1184, 1188 (1st ___ ______ ______________________ Cir.), cert. denied, 116 S. Ct. 1423 (1995). The facts are ____________ described as the jury might have found them, drawing reasonable inferences in favor of the plaintiffs. A. The Ansin Investment in River Oaks _____________________________________ Lawrence (Larry) Ansin, a Massachusetts fabric manufacturer, met Stephen Simons, then a furniture buyer with a Texas retailer, in the mid-1970s. What began as a business relationship grew, over the next decade, into a friendship.  The two men vacationed together and visited each other's homes. In 1987, Simons started his own upholstered furniture company in Mississippi. The company had six original investors in addition to Simons; five of these men, including Thomas Keenum, had been involved with the start-up -3- 3 and eventual IPO of another Mississippi upholstery manufacturer. The sixth investor was Larry Ansin, who was, at that time, the chief executive officer and sole shareholder of Joan Fabrics, a Massachusetts-based company. River Oaks Furniture, Inc. was incorporated in August 1987. Larry Ansin's total investment in the venture was $100,000, for which he was issued a certificate, dated September 1, 1987, for 7,500 shares of common stock. That was 10% of the then-issued shares. Simons owned 30,000 shares and was president of the company; Keenum owned 7,500 shares and was secretary and treasurer. Keenum and Simons were two of the three members of the Board of Directors. In March 1988, the River Oaks investors set up another Mississippi corporation, R-O Realty, Inc., to own real estate which would then be leased to River Oaks. Each of the original investors contributed another $500 in capital and Larry Ansin was issued a share certificate for 437.5 shares in R-O Realty. In 1988, Larry Ansin decided to sell Joan Fabrics.  Larry Ansin expected that, as part of such a transaction, he would have to sign a non-competition agreement, which would preclude him from owning stock in another furniture company. Accordingly, Larry Ansin arranged to sell his River Oaks shares to his father, Harold Ansin, for the $100,000 he had originally invested. The Ansins executed a Stock Purchase -4- 4 Agreement dated May 31, 1988. Harold Ansin did not know how many shares he was purchasing, but understood that he was buying his son's entire 10% interest in River Oaks. In April 1992, Larry Ansin learned that he had an inoperable brain tumor. He died on June 24, 1993, before the commencement of this litigation. B. The Reduction of the Ansin Interest to 4,000 Shares ______________________________________________________ Harold Ansin did not sell any of the River Oaks shares until 1992. Nonetheless, at some point in 1989, the Ansin ownership interest was reduced from 7,500 to 4,000 shares, or from 10% to 4% of the company.2 The company issued 25,000 new shares in 1989, but that legitimate dilution would only have reduced the Ansin stake to 7.5%. Following Harold Ansin's purchase of his son's shares, River Oaks did not issue a new stock certificate in Harold Ansin's name. Harold Ansin was upset about this and kept asking Larry to do something about it. Larry Ansin wrote to Simons twice in 1989 requesting a new share certificate for Harold. Eventually, a certificate was issued on September 22, 1989 which indicated that, as of January 1, 1988, Harold Ansin owned 4,000 shares of River Oaks.   ____________________ 2. The River Oaks 1988 tax return lists Harold Ansin as owning 7,500 shares. Harold Ansin's River Oaks 1988 K-1, a tax form issued to shareholders by the corporation, states that Ansin owned 10% of the company. Ansin's 1989 K-1, however, indicated that Ansin now owned only 4% of the company.  -5- 5 The Stock Transfer Ledger of River Oaks Furniture, which was not actually typed up (from Keenum's notes) until 1993, shows Lawrence Ansin as originally owning 7,500 shares. However, according to the Ledger, Ansin transferred only 4,000 shares to his father on January 1, 1988, and then transferred 1,000 shares to Simons and 2,500 shares to Donald Franks, another of the original River Oaks investors, on January 1, 1989. Simons testified that these transfers of stock by Larry Ansin were part of a general reallocation of shares undertaken in early 1989. According to Simons, during a telephone conversation in February or March 1989, he told Larry Ansin that, in order to recruit talented new employees, the company wished to issue 25,000 new shares of stock. Simons further testified that Larry Ansin then orally agreed to reduce his ownership interest to 4%. However, Simons acknowledged that there is no record of this conversation nor any contemporaneous records or correspondence memorializing the transfers to Simons and Franks. Simons also testified that he and Ansin only discussed percentages of ownership, as opposed to numbers of shares, and that Ansin did not receive any money for the transfers. Simons did not speak to Harold Ansin about the transfers.  Thomas Keenum, who, as company secretary, was responsible for maintaining the Stock Transfer Ledger, -6- 6 testified that no document, other than his personal notes, records these stock transactions, and that only Simons, and not the Ansins, ever communicated with him about the decrease in the Ansin ownership interest. Although other capital transactions are recorded in the minutes of the Board of Directors, the Ansin transfers were not, nor to Keenum's knowledge, were there any signed agreements, letters, or memoranda noting these transfers.  The foundation documents of River Oaks included Articles of Incorporation, By-Laws, and a Subscription Agreement among the stockholders. These documents regulated, among other things, the transfer of shares in the company. Paragraph 12 of the Articles of Incorporation provided that: before a transfer [of stock] may be made, [the] owner or holder shall notify the secretary/treasurer of this corporation in writing of the number of shares to be transferred, the certificate involved [and other pertinent information].  The Subscription Agreement, which was "binding upon and shall inure to the benefit of each individual Stockholder and his respective heirs, executors, administrators, assigns and legal representatives," recited that "[e]ach Stockholder agrees that all shares of Stock of the Company . . . shall be subject to the terms and conditions of Paragraph Number 12 of the Articles of Incorporation." The By-Laws, which charged the secretary with maintaining the stock transfer books of the corporation,  -7- 7 stated that:  Transfer of shares of the corporation shall be made only on the stock transfer books of the corporation by the holder of record thereof or by his legal representative . . . .   At trial, the plaintiffs argued that these documents constituted an enforceable contract, and that defendants' unauthorized transfer of 3,500 River Oaks shares to Simons and Franks amounted to a breach of that contract. C. The Repurchase of the Ansin Interest and the IPO ___________________________________________________ The original investors in River Oaks had hoped, from the beginning, eventually to take the company public. During the first quarter of 1992, the company took the first step of talking to an investment banker about a public offering. Breck Walker, a managing director of J.C. Bradford & Co., a Nashville investment bank, visited River Oaks several times during the first half of 1992, to evaluate the company's prospects as an IPO candidate.  These contacts culminated in an April 23, 1992 meeting in Nashville between the River Oaks management, including Keenum and Simons, and the J.C. Bradford commitment committee.3 At the meeting, River Oaks' value was discussed and, according to the notes of a J.C. Bradford analyst,  ____________________ 3. The commitment committee is a group of top-level executives at J.C. Bradford who must approve all IPO transactions.  -8- 8 Keenum stated that a value of $25 million was "about right." Analyses prepared by J.C. Bradford for internal use projected a range of values from $16.3 million to $31 million, depending on the assumptions used, and similar valuations were discussed with River Oaks personnel. Shortly thereafter, J.C. Bradford determined that, given all the circumstances, including market conditions, River Oaks was not a candidate for an IPO in 1992. J.C. Bradford advised River Oaks to wait until the end of 1992 or early 1993 to see if the company met its projections before proceeding further. At approximately the same time, April 1992, Larry Ansin learned that he had a brain tumor. After his diagnosis, Ansin asked Patrick Maraghy, his tax planner, to act as an intermediary in his financial dealings. Ansin continued to make his own decisions.  In July 1992, Walter Billingsley, the River Oaks controller, and Simons contacted Maraghy about refinancing River Oaks' debt. Ansin, like the other original shareholders, had previously signed personal guarantees for bank loans to River Oaks; now, the Bank of Mississippi wanted another personal guarantee from Ansin for $550,000 of new financing. Maraghy communicated the request to Ansin, who declined to provide new guarantees because he was very ill and because he was no longer a shareholder of River Oaks. -9- 9 Through August and into September of 1992, Simons continued to call Maraghy frequently, pressuring him to get Larry Ansin to reconsider his decision. At no time did Simons tell Maraghy that the bank had agreed, on August 5, 1992, to proceed with the refinancing without a new guarantee from Larry Ansin. Instead, Simons represented that the company would have problems without the new Ansin guarantee, and that people would be thrown out of work. In early September, Simons asked if Harold Ansin would sign a personal guarantee, but Harold Ansin declined.  In mid- to late-September, Simons called Maraghy and asked if the Ansins would be willing to sell their stock back to River Oaks so that someone else could purchase it and provide the guarantee. The Ansins agreed, believing that the sale would help Simons obtain the needed financing. On October 19, 1992, Keenum called Maraghy to discuss an offer of $300,000 for the Ansin River Oaks Furniture and R-O Realty shares. Keenum told Maraghy that River Oaks had recently bought out Keith Franklin, the only other non-management shareholder, for $60,000 per 1% interest, indicating that $300,000 was a fair price for the Ansin's 4% interest in River Oaks. Keenum also told Maraghy that the R-O Realty shares were valueless, as R-O Realty's properties were heavily encumbered with debt.  -10- 10 The Ansins agreed to the sale, believing that the price was fair and that they were accommodating Simons' need for bank financing. Simons wrote to Maraghy, thanking him "for helping me resolve this problem."4 The sale of the Ansin shares for $300,000 was closed in November 1992. In board meetings on November 19, 1992, and December 1, 1992, the directors of River Oaks authorized the resale of the Ansin River Oaks shares, for the same price River Oaks had paid, to Keenum, Billingsley, and other original River Oaks investors. The Board had already authorized the resale of the Ansin R-O Realty shares to Keenum, Simons and other insiders on September 1, 1992, even though the repurchase offer had not yet been made. Everyone purchasing Ansin shares was familiar with the IPO discussions with J.C. Bradford. Keenum and Simons acknowledge that, during the repurchase discussions, they never told Maraghy about the meetings with J.C. Bradford or about the prospect of restarting IPO discussions in early 1993. Although there were no ongoing negotiations in November 1992, Billingsley testified that River Oaks' management knew by October or November 1992 that the company would meet its sales projections for 1992 and so would meet the condition set by  ____________________ 4. Before finalizing the sale, Harold Ansin transferred the shares to the Ansin Foundation, a family charitable trust, for tax reasons. -11- 11 J.C. Bradford for following up on the IPO. During a conference call on December 7, 1992, less than two weeks after the Ansin repurchase, Ron Ashby, River Oaks' outside auditor, discussed the impact of an IPO on River Oaks' accounting for employee loans with Keenum and other River Oaks personnel. Ashby's notes, made in the month or two prior to that call, indicate that River Oaks was looking at an IPO in July or August 1993. Simons testified that, in one phone conversation in early 1992, he told Larry Ansin that River Oaks had made initial contact with an unspecified investment banker, and that Larry Ansin thought going public was a great idea. However, Harold Ansin, Maraghy, and Susan Ansin, Larry's wife, all testified that Larry Ansin never mentioned the possibility of an IPO, even though they all stated that Larry discussed business with them regularly. The River Oaks board approved an IPO on March 1, 1993. Maraghy first learned that an IPO was being planned from a June 1993 newspaper article. By this time, Larry Ansin had died. River Oaks went public on August 26, 1993 for $12 per share. As part of the transaction, River Oaks effected a 28.8 for 1 stock split on June 23, 1993. This meant that the Ansins' 7,500 shares would have become 216,000 shares. Additionally, R-O Realty was merged into River Oaks -12- 12 furniture, and the R-O Realty shareholders received $1.2 million of River Oaks stock. From the proceeds of the offering, River Oaks distributed $2,465,000 of previous earnings to its pre-IPO shareholders.  Finally, the plaintiffs learned from the prospectus of the existence of River Wood Products, Inc. River Wood had been established in 1991 to produce furniture frames for River Oaks. Although there were no significant financial benefits to setting up River Wood as a separate corporation, a 1991 memo from Ashby indicated that "a political reason for setting up . . . separate corporations would be to exclude certain current River Oaks shareholders." Harold Ansin was one of the shareholders excluded. At the time of the IPO, River Wood shareholders received shares of River Oaks Furniture stock.  At trial, plaintiffs' expert testified that if the Ansins had held 7,500 shares prior to the IPO and then sold them at the end of the restricted period, they would have received a total of $4,179,140. This figure included proportional allocations of River Oaks Furniture shares for the Ansin R-O Realty shares and for a hypothetical 7.5% interest in River Wood Products. It also included a share of the S-corporation distribution.  II. -13- 13 The Ansins filed suit on October 4, 1993, alleging securities law violations, fraud, breach of fiduciary duty, malpractice and Mass. Gen. L. ch. 93A claims arising from defendants' failure to disclose the planned IPO. After discovery, on June 17, 1994, plaintiffs filed a Second Amended Complaint, adding a conversion claim for the reduction of the Ansin interest to 4,000 shares. The district court granted a defense motion to dismiss the ch. 93A and malpractice claims on October 12, 1994. On July 5, 1995, a Third Amended Complaint was filed, which included a breach of contract claim arising from the same facts as the conversion claim.  On November 15, 1995, the district court granted defendant's motion for summary judgment on the conversion claim, finding that the Massachusetts three-year statute of limitations for torts barred any conversion claim that the Ansins should have discovered prior to October 4, 1990. The district court found that various 1989 tax documents, signed by Harold Ansin and indicating that he owned a 4,000 share or 4% interest in River Oaks, should have alerted Ansin to the alleged conversion.  The remaining claims were tried to a jury. The jury returned a special verdict form finding that: 1) defendants violated the Securities Exchange Act and engaged in common law fraud by failing to disclose the public -14- 14 offering discussions with J.C. Bradford; 2) River Oaks committed a breach of contract when the Ansin interest was reduced to 4,000 shares; 3) Simons and/or Keenum breached the fiduciary duty owed by a dominant shareholder to a minority shareholder by failing to disclose the discussions with J.C. Bradford and by failing to offer the Ansins the opportunity to participate in River Wood Products, Inc. The jury awarded compensatory damages of $1,082,400 against all defendants for the fraud claims, $1,209,600 against River Oaks for the breach of contract, and $16,400 against Simons and Keenum for the breach of fiduciary duty. It also awarded punitive damages under Mississippi law of $25,000 against Simons and of $100,000 against Keenum. The defendants moved for judgment as a matter of law at the close of plaintiffs' case, after the verdict, and following the entry of judgment. On April 26, 1996, defendants moved, pursuant to Rule 49(a), Fed. R. Civ. P., to have the court address issues not submitted to the jury. The district court denied these motions.  III. Defendants make numerous arguments with regard to each count of the verdict and the damages awarded. We examine these contentions in turn.5  ____________________ 5. Except as otherwise noted, the parties agree that Mississippi law is the relevant substantive law on the state law claims, and that Massachusetts provides the relevant -15- 15 A. The Federal Securities and Common Law Fraud Claims _____________________________________________________ The federal securities claim alleged violations of 10(b) of the Securities Exchange Act and Rule 10b-5. Defendants argue that the district court erred in denying their motion for a judgment as a matter of law on the federal securities law and Mississippi common law fraud claims. Specifically, defendants assert that there was no evidence of omission or misrepresentation, of fraudulent intent, of materiality or of reliance.  Review of the district court's denial of a motion for judgment as a matter of law is plenary. See Correa, 69 ___ ______ F.3d at 1191. As did the district judge, we review the record in the light most favorable to the non-moving party. Id. We will "reverse the denial of such a motion only if ___ reasonable persons could not have reached the conclusion that the jury embraced." Sanchez v. Puerto Rico Oil Co., 37 F.3d _______ ___________________ 712, 716 (1st Cir. 1994). The record shows sufficient evidence to support the jury's verdict. Defendants contend that there was no material omission because Simons testified that he told Larry Ansin, in early 1992, about the initial contact with J.C. Bradford. However, Simons himself never claimed that he had told Ansin about J.C. Bradford's specific recommendations as to the possible timing of an IPO, or that he had told Ansin  ____________________ procedural provisions. -16- 16 about the valuation analyses performed by the investment bank. Nor did Simons or Keenum mention the possibility of an IPO to Maraghy at the time of the negotiated sale. Thus, even crediting Simons' uncorroborated testimony, which the jury need not do, the jury could reasonably find that information about the IPO negotiations was omitted. As to evidence of intent, defendants contend that there was no possible motive for fraud, because River Oaks resold the Ansin shares to other insiders at the same price the corporation had paid for them, thereby depriving the corporation of the fruits of its fraud. However, the jury could reasonably infer, from the evidence, that the individual defendants, officers and directors of River Oaks, were working to exclude the Ansins, the only remaining non- management shareholders, from the River Oaks IPO, and were seeking ultimately to benefit themselves and the other Mississippi management shareholders at the Ansins' expense. Defendants also argue that there was no evidence that the undisclosed information was material. The materiality standard under the federal securities laws is a familiar one: Information is material if "there is a reasonable likelihood that a reasonable investor would consider it important." Glassman v. Computervision Corp., 90 ________ ____________________ F.3d 617, 632 (1st Cir. 1996); see also Shaw v. Digital _________ ____ _______ Equip. Corp., 82 F.3d 1194, 1219 (1st Cir. 1996)(citing _____________ -17- 17 Basic, Inc. v. Levinson, 485 U.S. 224, 231-232 (1988)). This ___________ ________ court has repeatedly held that the question of the materiality of omitted information is one peculiarly for the trier of fact. See Lucia v. Prospect St. High Income ___ _____ __________________________ Portfolio, Inc., 36 F.3d 170, 176 (1st Cir. 1994)(citing ________________ cases). Defendants contend that the prior discussions with J.C. Bradford were insignificant because no negotiations were ongoing at the time of the Ansin repurchase. However, the evidence showed that less than two weeks after the Ansin repurchase, River Oaks' management was "looking at a July or August 1993" IPO, and adjusting its accounting strategies accordingly. This is not a case where the defendants themselves "placed no special significance" on the omitted information. Cf. Jackvony v. RIHT Fin. Corp., 873 F.2d 411, ___ ________ _______________ 415 (1st Cir. 1989); Taylor v. First Union Corp., 857 F.2d ______ __________________ 240, 244 (4th Cir. 1988)("vague agreement" as to future merger not material where neither "the factual nor the legal" predicates for transaction were in place). The jury's conclusion that the earlier negotiations were material is patently reasonable. Finally, defendants contend that there was no evidence of reliance on the omissions. Because of the logical impossibility of proving that plaintiffs relied on information that they did not have, "[p]ositive proof of -18- 18 reliance on omissions is not necessary where materiality has been established." Holmes v. Bateson, 583 F.2d 542, 558 (1st ______ _______ Cir. 1978). In any case, Harold Ansin testified that he did rely on information obtained from Simons.  Thus, defendants' insufficiency arguments with regard to the securities law and fraud claims are unavailing. A reasonable jury could, and did, conclude that defendants intentionally defrauded plaintiffs by failing to disclose material information about the contemplated IPO. B. The Breach of Contract Claim _______________________________ The defendants also argue that what plaintiffs styled a breach of contract claim is essentially a conversion claim, and therefore barred by the statute of limitations. They also claim that the evidence was insufficient to support the jury verdict on this claim, and that Harold Ansin and the Ansin Foundation lack standing to bring this claim. 1. Statute of Limitations _________________________ Defendants argue that plaintiffs simply recast their time-barred conversion claim as a breach of contract claim,6 and that this claim should therefore be subject to  ____________________ 6. Although defendants suggest that plaintiffs repleaded their conversion claim as breach of contract after the _____ district judge had found that their tort claim was barred, this is factually incorrect. Moreover, the district judge, in his opinion granting summary judgment on the conversion claim, specifically noted that, although the contract claim pleaded the same facts, defendants had not moved for summary -19- 19 the Massachusetts three-year tort statute of limitations (Mass. Gen. Laws ch. 260, 2A), rather than the Massachusetts six-year contract statute (Mass. Gen. Laws ch. 260, 2).7 Defendants cite Massachusetts caselaw for the principle that "the determination of whether the contract or tort statute of limitations applies is controlled by the essential nature of [the] claim." Oliveira v. Pereira, 605 ________ _______ N.E.2d 287, 290 (Mass. 1992). This principle may be useful in determining what statute of limitations to apply to a statutory claim, where the statute giving rise to the cause of action does not specify a limitations period. See, e.g., ___ ____ id. at 289-91. It may also apply in the extreme case in ___ which a personal injury, such as emotional distress, is inappropriately cast as a breach of contract. See Pagliuca ___ ________ v. City of Boston, 626 N.E.2d 625, 628 (Mass. Ct. App. 1994). ______________ However, this principle has not been held to restrict plaintiffs to a single theory of liability per set of operative facts, where such facts can fairly support two theories of liability.  Here, the plaintiffs' claim -- that their shares were transferred without their knowledge or consent, in derogation of contractual terms -- can be fairly  ____________________ judgment on that claim and that his ruling did not reach that count.  7. The parties agree that Massachusetts law supplies the applicable statute of limitations. -20- 20 characterized as either an action for conversion or an action for breach of contract. It does not involve the type of "accident[] resulting in injuries to person or property" on which the draftsmen of Massachusetts' three-year tort statute focussed. Royal-Globe Ins. Co. v. Craven, 585 N.E.2d 315, ____________________ ______ 320 (Mass. 1992). Rather, it does involve a claim "to recover from another money which in equity and good conscience he is not entitled to keep." The latter type of claim, according to the Supreme Judicial Court, is usually advanced in a contract action. Kagan v. Levenson, 134 N.E.2d _____ ________ 415, 417 (Mass. 1956). In these circumstances, it was not error for the district court to apply the six-year contract statute of limitations to plaintiffs' contract claim. 2. Insufficiency of the Breach of Contract Evidence and _____________________________________________________________ Enforceability of Rights ________________________ The defendants assert that there is no evidence that Larry Ansin did not agree to the reduction in shares. They also deny that the foundation corporate documents of River Oaks created enforceable rights in the plaintiffs. This is simply not so. As with the fraud claims, defendants rely on Simons' uncorroborated report of his phone conversation with Larry Ansin. With regard to the contract claim, Simons testified that, in early 1989, Ansin orally agreed to a -21- 21 reduction in his percentage of ownership. Simons does not assert that he mentioned specific numbers of shares to Ansin, nor does he claim that Ansin received any compensation for these transfers. Simons testified that Larry Ansin did not agree to transfer shares to himself or to Franks (the recipients of the shares). Simons and Keenum both acknowledged that there was no documentation of these transfers. Simons described a complex reallocation of shares, undertaken to allow shares to be issued to new key personnel. However, Keenum acknowledged that 25,000 new shares were issued in 1989, and that the new employees were issued exactly 25,000 shares. This negated the reallocation as a reason for the reduction in Ansin's shares. Additionally, in the reallocation described by Keenum, only Harold Ansin had to give up shares; Simons' percentage of ownership was diluted by the new issuance, but he actually gained 1,000 shares (from the alleged transfer from Ansin).  Even if the jury credited Simons' description of Larry Ansin's oral consent, the jury could have reasonably inferred that Ansin only consented to dilution, and not to a transfer of shares. Additionally, when evaluating a series of events that, judging from the trial exhibits, left a heavy paper trail, the jury was entitled to draw inferences from -22- 22 the complete absence of contemporaneous documentation of the ________________ purported Ansin transfers. Defendants also contend that the foundational documents of River Oaks did not create any rights in the Ansins with regard to transfers. Defendants do not challenge the basic premise that, under Mississippi law, such documents may form a contract. Rather, they contend that the specific transfer provisions were only for the benefit of the corporation, and thus created no rights in the shareholders. However, the plain language of the Subscription Agreement states that "this Agreement shall be binding upon and shall inure to the benefit of each individual Stockholder . . . and ___________________________________________________ to the Company . . . ." While the transfer provisions of the Articles of Incorporation and the By-Laws may have been primarily intended to prevent the unauthorized sale of shares to outsiders, as defendants contend, this does not mean that they served no other purpose. To the contrary, the traditional common law of unauthorized transfers places heavy duties on the corporation: Courts held that a corporation whose stock was transferable only on the books of the company was, to a certain extent at least, a trustee for its shareholders in respect to their stock. . . . [I]t had to respond in damages for any injury sustained by them in consequence of its negligence or misconduct. . . . This liability rested . . . upon the ground of breach of contract upon the part of the -23- 23 company, of this undertaking to hold the stock for the benefit of the true owner of the certificate. 12 Fletcher Cyclopedia of the Law of Corporations 5538, at ______________________________________________ 406 (perm. ed. 1996)(footnotes omitted). Moreover, the Cyclopedia explains that: The shareholders also have a right to expect that the corporation will observe its own bylaws in relation to the transfer, and it is liable for any damages resulting to them by reason of its failure to do so. Id. (footnotes omitted). ___ This authority is sufficient to rebut defendants' contention that the plain language of River Oaks' transfer provisions can only be read to create rights in the corporation. The defendants point to nothing in either the documents or in Mississippi law that would require a jury to conclude that River Oaks shareholders had no rights under these documents as to transfers. Accordingly, the jury's verdict on the breach of contract claim stands. 3. Standing ___________ The defendants assert that Harold Ansin and the Ansin Foundation lack standing to bring a contract claim because they were not in privity of contract with River Oaks. However, defendants acknowledge that Larry Ansin's estate would have standing to bring such a suit, were it not for the fact that, in their view, Larry Ansin acquiesced in the breach and suffered no damages. The jury plainly rejected -24- 24 these assertions. Assuming arguendo that defendants are ________ correct that, as a matter of Mississippi law, Harold Ansin could not bring this suit, we find that, as Larry Ansin's estate indisputably had standing, this claim has no possible bearing on the outcome of the case. C. The Breach of Fiduciary Duty Claim _____________________________________ Defendants take the position that, under Mississippi law, shareholders may not sue, as individuals, for breach of fiduciary duty by the officers and directors of a close corporation. However, Mississippi case law recognizes the ability of shareholders in close corporations to sue for breach of fiduciary duty. See Fought v. Morris, ___ ______ ______ 543 So. 2d 167, 172-73 (Miss. 1989). The Mississippi Supreme Court has specifically stated, in the context of a suit for diversion of corporate opportunity, that a trial court may, "in the case of a closely held corporation, . . . treat an action raising derivative claims as a direct action . . . and order an individual recovery." Derouen v. Murray, 604 So. 2d _______ ______ 1086, 1091 n.2 (Miss. 1992). Defendants' argument as to the fiduciary duty claim is without merit. D. Affirmative Defenses _______________________ Defendants assert that equitable defenses barred both the contract claim and the fraud claims. Defendants did not submit these affirmative defenses - laches, waiver, ratification and estoppel - to the jury. Instead, in a post- -25- 25 trial motion pursuant to Rule 49(a), defendants requested the district judge to rule on the applicability of these affirmative defenses. The district court denied this motion, without opinion. Under Rule 49(a), if the district court does not make a finding on an issue not submitted to the jury, "it will be presumed on appeal that the lower court made whatever finding was necessary in order to support the judgment that was entered." 9A Wright & Miller, Federal Practice and ______________________ Procedure, 2507, at 185-86 (1995); see also Kavanaugh v. _________ ________ _________ Greenlee Tool Co., 944 F.2d 7, 11-12 (1st Cir. 1991). As the _________________ district court entered a judgment for the plaintiffs, we presume that it found that defendants had not proven the claimed equitable defenses. The defendants argue that the breach of contract claim was barred by laches, based on the district court's finding, in the context of the conversion claim, that the Ansins should have discovered the reduction in their interest when signing the 1989 tax documents. The defense was prejudiced by plaintiffs' delay in filing suit until 1993, defendants argue, because Larry Ansin died in the interim. We review the district court's determination as to laches for abuse of discretion. See Murphy v. Timberlane ___ ______ __________ Reg'l Sch. Dist., 973 F.2d 13, 16 (1st Cir. 1992). The _________________ parties have not adequately addressed which law governs this -26- 26 issue. However, Massachusetts and Mississippi law (as well as general principles of equity) are consistent on this point, and so there is no need to address the conflicts question. If the statute of limitations has not run, as is the case here, the defendant bears a heavy burden of demonstrating the unreasonableness of delay and the occurrence of prejudice. See K-Mart Corp. v. Oriental Plaza, ___ ____________ _______________ Inc., 875 F.2d 907, 911 (1st Cir. 1989); Hans v. Hans, 482 ____ ____ ____ So. 2d 1117, 1121 (Miss. 1986) ("no claim is barred by laches until the limitation has attached"); cf. Srebnick v. Lo-Law ___ ________ ______ Transit Mgmt., Inc.., 557 N.E.2d 81, 85 (Mass. Ct. App. 1990) ____________________ ("As long as there is no statute of limitations problem, unreasonable delay in pressing a legal claim does not, as a matter of substantive law, constitute laches."). Also, the district court could have found that defendants' unsavory conduct precluded them from arguing that they reasonably relied on the plaintiffs' acquiescence in the transfer of shares. See K-Mart Corp., 875 F.2d at 911 (party seeking to ___ _____________ invoke laches should not "call . . . attention to [its] left hand while surreptitiously pocketing the family jewels with [its] right hand"). Under these circumstances, it was not an abuse of discretion for the district court to find the defense of laches inapplicable. -27- 27 Defendants also argue that plaintiffs' two-month delay between learning of the planned IPO and filing suit constitutes laches, waiver, estoppel, and ratification so as to bar the fraud claims. Any claim of prejudice to the defendants from this delay is tenuous, as Larry Ansin had already died when Patrick Maraghy learned of the planned IPO. Given the maxim that "he who comes into equity must come with clean hands," see, e.g, Texaco Puerto Rico, Inc. v. ___ ____ _________________________ Dep't of Consumer Affairs, 60 F.3d 867, 880 (1st Cir. 1995), __________________________ the district court did not abuse its discretion by declining to apply these equitable defenses to plaintiffs' fraud claims. E. Compensatory Damages  _______________________ 1. Securities Law _________________ The Supreme Court has held that damages under Rule 10b-5 should be "the difference between the fair value of all that the . . . seller received and the fair value of what he would have received had there been no fraudulent conduct." Affiliated Ute Citizens v. United States, 406 U.S. 128, 155 _______________________ _____________ (1972); see also Holmes, 583 F.2d at 562. On the Ansins' ________ ______ securities law claim, the court instructed the jurors to find "the difference between what the Ansins actually received for their stock and what you believe they would have received had they refused to sell or, instead, insisted on different terms." The jury was told that "the issue is not hindsight," -28- 28 and that they "must evaluate the Ansins' decision in light of the facts and circumstances that existed at the time that the decision to sell was made."  Defendants argue that the district court's jury instructions as to the damages for the fraud claims were flawed, in that the district court failed to tell the jury to determine value as of the time of the fraudulent transaction, __ __ ___ ____ __ ___ __________ ___________ i.e. in November 1992. The jury awarded damages of $12 per share, the public offering price of River Oaks.8 This was less than the $17.40 a share which plaintiffs sought and more than the damages defendants say are the maximum allowable. Defendants contend that the pre-IPO value of the company was much lower, and support this contention by pointing to the immediate resale of the Ansin shares to knowledgeable insiders at the same price paid to the Ansins. The federal securities statutes are not explicit as to the proper measure of damages. Section 28 of the Securities Exchange Act limits recovery to "actual damages on account of the act complained of." 15 U.S.C. 78bb. The definition of "actual damages," however, has been left to the courts. This question presents difficulties, which are  ____________________ 8. The jury award apparently was based on the premise that the Ansins would have participated in the 28.8 for 1 stock split. The jury then deducted the $300,000 the Ansins had actually received for their stock. The jury did not, apparently, include compensatory damages for the R-O Realty shares, or for the S corporation earnings distributed to former shareholders at the time of the offering. -29- 29 greatest in cases involving closely held securities that have no readily ascertainable market value. See 3 Bromberg & ___ Lowenfels, Securities Fraud & Commodities Fraud 9.1, at 228 ____________________________________ (2d ed. 1996). The trier of fact may draw reasonable inferences in determining "fair value," and "is not restricted to actual sale prices in a market so isolated and so thin" as one for a close corporation's stock. Affiliated Ute, 406 U.S. at 155. ______________ A variety of factors, including anticipated future appreciation, may affect the value of stock, so that an appraisal of value "demand[s] a more sophisticated approach than the simple application of a price index to the shares." Holmes, 583 F.2d at 564. ______ Here, the very nature of the fraud was to induce the plaintiffs to sell their stock at a time before the stock would appreciate in value due to the contemplated IPO and stock split. To adopt defendants' argument that damages cannot exceed the price of the shares at the time of the sale would be to reward and encourage such chicanery. Defendants' attempt to limit plaintiffs' recovery to a hypothetical "market" price as of November 1992 is unavailing. The trier of fact was entitled to infer that a reasonable investor, fully informed of the IPO discussions, including the conditions set by J.C. Bradford, would not have sold his -30- 30 stock in November 1992 for less than his proportionate share of the IPO proceeds.  The anticipated appreciation in the value of the stock was not unforeseeable. Internal River Oaks documents as to planning and projections indicated that a 1993 IPO was anticipated. J.C. Bradford analysts had suggested a range of values for the company in light of the anticipated IPO, information which was withheld from the plaintiffs. That these analyses and projections were, to some extent, contingent does not mean that they are irrelevant to determining fair value. As another court of appeals has said: The relevance of the fact [that the defendant close corporation was involved in merger negotiations] does not depend on how things turn out. Just as a lie that overstates a firm's prospects is a violation even if, against all odds, every fantasy comes true, so a failure to disclose an important beneficent event is a violation even if things later go sour. The news . . . allows investors to assess the worth of the stock. . . . Investors will either hold the stock or demand a price that reflects the value of that information. Jordan v. Duff & Phelps, Inc., 815 F.2d 429, 440 (7th Cir. ______ ____________________ 1987)(internal citation omitted). In these circumstances, the IPO price was a reasonable approximation of fair value. -31- 31 We note it was less than the aftermarket price plaintiffs suggested as damages.9 Defendants draw our attention to two district court cases. In Ross v. Licht, 263 F. Supp. 395 (S.D.N.Y. 1967), ____ _____ the court based damages for failure to disclose IPO plans not on the IPO price, but on the lower price obtained in an intervening private placement. Id. at 411. However, as one ___ commentary has pointed out, the court was "probably justified" in using the lower measure because the private placement was a necessary precondition to the public offering. Bromberg & Lowenfels, supra, 9.1, at 228 n.12. _____ Defendants have pointed to no such determinative intervening event here. Defendants also point to Hutt v. Dean Witter ____ ____________ Reynolds, Inc., 737 F. Supp. 128 (D. Mass. 1990). In Hutt, ______________ ____ the accretion in value was due to the stock's trading in a public market over time. The court accordingly found plaintiffs' potential profits to be "too speculative." Id. ___ at 133. Here, by contrast, plaintiffs point to a specific, planned-for event.   ____________________ 9. We also note that the damages here are consistent with the rule of Janigan v. Taylor, 344 F.2d 781 (1st Cir. 1965). _______ ______ In Janigan, this court held that, when property is sold to _______ the fraud-committing party, even "future accretions not foreseeable at the time of the transfer . . . are subject to another factor, viz., that they accrued to the fraudulent party." Id. at 786. While the individual defendants did not ___ purchase all the Ansins' stock, the rest of the Ansins' shares were sold to other knowledgeable River Oaks insiders, who thereby reaped the profits of defendants' fraud. -32- 32 Because we affirm the award of damages on the federal securities law claim, we do not reach the state fraud claim. Holmes, 583 F.2d at 560. ______ 2. Breach of Contract _____________________ Defendants also appeal the award of damages on the contract claim, arguing the jury should have been told to value damages "as of the time of the breach." The district court instructed the jury to determine when the Ansins would have sold the missing 3,500 shares, and to determine what they would have received at that time. The jury apparently determined that the Ansins would have held the shares until the IPO, and awarded $12 per share, accounting for the 28.8 for 1 stock split. Whatever the merits of defendants argument, they failed to object to the court's instruction at trial, and so the issue has not been preserved for appeal.10 See Fed R. Civ. P. 51; Pinkham v. Burgess, 933 F.2d 1066, ___ _______ _______ 1069 (1st Cir. 1991). The contract award of compensatory damages is affirmed. F. Punitive Damages ___________________ Defendants argue that the award of punitive damages cannot be sustained because such damages are unavailable under the securities laws and under Mississippi law. Although the defendants are right as to the securities laws,  ____________________ 10. Defendants do not attempt to contend that the challenged instruction constituted plain error. -33- 33 see 15 U.S.C. 78bb, the district court correctly instructed ___ the jury on the Mississippi law on punitive damages. "The rule in Mississippi is settled that punitive damages are not recoverable for a breach of contract unless such breach is attended by intentional wrong, insult, abuse, or such gross negligence that amounts to an independent tort." Aetna Cas. and Sur. v. Steele, 373 So. 2d 797, 801 ___________________ ______ (Miss. 1979). Breach of fiduciary duty has been recognized by the Mississippi courts as an "extreme or a special additional circumstance where punitive damages may be awarded." Fought, 543 So. 2d at 173 (internal quotation marks ______ omitted). The jury found such a breach of duty here. Defendants contend that plaintiffs were required to adduce evidence as to defendants' net worth. Plaintiffs correctly respond that, under Mississippi law, the net worth inquiry is only one factor to be considered where the court seeks to determine if the punitive damages awarded by the jury are so excessively disproportionate as to shock the conscience of the court. See Bankers Life & Cas. Co. v. ___ ________________________ Crenshaw, 483 So. 2d 254, 279 (Miss. 1985) ("[N]o hard and ________ fast rule may be laid down with regard to the maximum amount of punitive damages that may be awarded in a given case."). That proportionality threshold is not crossed here. In any case, some evidence of defendants' net worth can be inferred from the evidence as to their River Oaks holdings.  -34- 34 "The award of punitive damages and the amount thereof is within the discretion of the trier of fact." Fought, 543 So. 2d at 173. "On appeal, an award will be ______ disturbed where it is so excessive that it evinces passion and prejudice on the part of the jury so as to shock the conscience of the court." Valley Forge Ins. Co. v. _________________________ Strickland, 620 So. 2d 535, 541 (Miss. 1993) On the facts of __________ this case, there was no abuse of discretion. The award of punitive damages is affirmed.  IV. Plaintiffs appeal the dismissal of their Mass. Gen. Laws ch. 93A claim. They also argue that the district judge erred in failing to award prejudgment interest and in dismissing their conversion claim. Because we affirm the jury's award on the contract claim, we need not reach the Ansins' contention with respect to the conversion claim.  A. The 93A Claim ________________ Plaintiffs claim that the actions of River Oaks, Simons, and Keenum in the various transactions at issue here constitute unfair and deceptive business practices within the meaning of Mass. Gen. Laws ch. 93A, 2, 11. The district court granted judgment on the pleadings for defendants. Review is de novo. United States v. Rhode Island Insurers' ________ _____________ _______________________ Insolvency Fund, 80 F.3d 616, 619 (1st Cir. 1996).  _______________ -35- 35 Mass. Gen. Laws ch. 93A gives a private right of action to any person injured by "an unfair or deceptive act or practice" in trade or commerce "directly or indirectly affecting the people of this Commonwealth." Mass. Gen. Laws ch. 93A, 2, 9. Before January 1988, the statute was construed as not applying to securities laws claims See, ____ e.g., Cabot Corp. v. Baddour, 477 N.E.2d 399, 402 (Mass. ____ ___________ _______ 1985). In 1987, the Massachusetts legislature amended the definitions section of the statute so that "trade" and "commerce" now include "the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of . . . any security." Mass Gen. Laws ch. 93A, 1(b). "Security" is defined broadly under Massachusetts law to include any stock. Mass. Gen. Laws ch. 110A, 401(k). The Supreme Judicial Court has construed ch. 93A as covering marketplace transactions, but not transactions "principally 'private in nature.'" See Manning v. Zuckerman, ___ _______ _________ 444 N.E.2d 1262, 1266 (1983). Transactions between joint venturers and fiduciaries who are part of a "single legal entity" do not meet the statute's jurisdictional "trade or commerce" requirement. Gilleran, The Law of Chapter 93A ________________________ 2:18, at 38-39 (1989). This principle was recently clearly restated in Szalla v. Locke, 657 N.E.2d 1267 (Mass. 1995): ______ _____ It is well established that disputes between parties in the same venture do not fall within the scope of G.L. c. 93A, 11. . . . The development of c. 93A -36- 36 suggests that the unfair or deceptive acts or practices prohibited are those that may arise between discrete, independent business entities, and not those that may occur within a single company. Id. at 1269 (internal citations omitted).  ___ Szalla, in offering examples of the types of ______ disputes not covered, cited Zimmerman v. Bogoff, 524 N.E.2d _________ ______ 849 (Mass. 1988), for the principle that "c. 93A [is] inapplicable to transactions and disputes between parties to [a] joint venture and fellow shareholders in a close corporation." It also cited Riseman v. Orion Research, 475 _______ ______________ N.E.2d 398 (1985), for the principle that "c. 93A [is] inapplicable to claims by [a] corporate stockholder against [a] corporation stemming from [a] dispute as to [the] internal governance of [the] corporation." Szalla, 657 ______ N.E.2d at 1269.  The plaintiff in Szalla, who was the business ______ partner of the defendant, attempted to argue that the statutory definition of "trade or commerce" included the act of "offering for sale . . . any services." Id. at 1270. ___ The trial court had found that the plaintiff, upon becoming partners with the defendant, had "sold his services to the business entity being formed by the parties." Id. The ___ Supreme Judicial Court found that, on these facts "[t]here ha[d] been no commercial transaction . . . in the sense required by c. 93A . . . . [T]he 'services contemplated by -37- 37 this definition are those offered generally by a person for sale to the public in a business transaction.'" Id. (quoting __ Manning v. Zuckerman). _______ _________ Here, plaintiffs argue that the statutory amendment, which included the sale of securities in the definition of "trade or commerce," makes the "trade or commerce" inquiry irrelevant. We read Szalla, particularly ______ its citation of Zimmerman, to require an independent analysis _________ of whether the transaction involved had a public aspect, even where the subject matter of the transaction is included in the definitional section of the statute.  Another case, Puritan Medical Center v. Cashman, _______________________ _______ 596 N.E.2d 1004 (Mass. 1992), is of assistance. There, the trial court found that the defendants, shareholders in a close corporation, had engaged in unfair and deceptive trade practices when they locked the plaintiff corporation out of space that had previously been rented to the corporation. Id. at 1006. On appeal to the Supreme Judicial Court, ___ defendants argued that they were not liable under ch. 93A because "the parties were acting as fiduciary participants in a closely held corporation rather than as separate entities in a public market setting." Id. at 1012. The SJC stated: ___ "We agree," and reversed. Id.  ___ -38- 38 After explaining that the transactions at issue were principally private in nature, the Puritan Medical ________________ Center opinion continued: ______ Further, the aggrieved party has ______________________________ available an alternative avenue of relief _________________________________________ in the form of a suit for breach of _________________________________________ fiduciary duty.  ______________ [I]f the defendants committed any unfair or deceptive acts, they necessarily occurred in the context of the parties' [shareholder] relationship . . . or arose out of that relationship . . . and not in an arm's-length commercial transaction between distinct business entities. Id. at 1012 (emphasis added)(internal citations omitted). ___ Here, the Ansins' suit is largely premised on River Oaks' status as a close corporation. There is no suggestion that these events could have or did transpire in a public market situation. Moreover, the Ansins have actually recovered on a fiduciary duty claim. Guided by the Massachusetts precedents, we find that this dispute amongst shareholders of a close corporation does not meet the jurisdictional "trade or commerce" requirement of Mass. Gen. Laws ch. 93A.  B. Prejudgment Interest _______________________ The plaintiffs argue that the district court erred by failing to award prejudgment interest. The original jury instructions contained no mention of prejudgment interest. At sidebar, plaintiffs' counsel requested a jury instruction on prejudgment interest "in order to preserve our right to -39- 39 prejudgment interest as awarded by anybody," the judge or the jury. Accordingly, after the jury returned its verdict for plaintiffs, the judge gave the jury a special interrogatory on prejudgment interest, instructing the jury that "[w]hether you choose to award interest is entirely a matter in your discretion." Plaintiffs' counsel did not object to this form of instruction. The jury did not award prejudgment interest. Post-trial, plaintiffs moved for entry of judgment including prejudgment interest. The district court denied this motion as moot. Plaintiffs argue, on appeal, that there is a presumption in favor of prejudgment interest under the federal securities laws, and that the district court judge failed to so instruct the jury. Plaintiffs failed to make a contemporaneous objection to the form of the jury instruction, and, absent plain error, this argument is waived.  However, plaintiffs also point out that, under a Mississippi statute enacted in 1989, judgments "shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint." Miss. Code Ann. 75-17-7. This statutory language, they assert, mandates an award of prejudgment interest on their state law claims. We do not read the statutory language, which does -40- 40 not distinguish between pre- and post-judgment interest, so broadly. The Mississippi case law indicates that the award of prejudgment interest remains within the discretion of the trial judge. See American Fire Protection, Inc. v. Lewis, ___ _______________________________ _____ 653 So. 2d 1387, 1391 (Miss. 1995)(depending on circumstances, prejudgment interest may or may not be proper, but should be allowed where necessary to adequately compensate plaintiff); Sunburst Bank v. Keith, 648 So. 2d ______________ _____ 1147, 1152 (Miss. 1995) ("award of prejudgment interest is normally left to the discretion of the trial judge").  The law of this circuit similarly recognizes the discretion of the trial judge in cases involving violations of the federal securities laws. See Riseman v. Orion ___ _______ _____ Research, 749 F.2d 915, 921 (1st Cir. 1984). There was no ________ abuse of discretion in the trial court's decision to abide by the jury's finding on prejudgment interest. V. Plaintiffs point to a clerical error in the Amended Judgment. We therefore direct the Clerk of the United States District Court for the District of Massachusetts to amend the judgment so that postjudgment interest accrues as of May 15, 1996, the date of the Original Judgment. In all other respects, the judgment is affirmed. _________ -41- 41