

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-11-2002

# Tse v. Ventana Med Sys Inc

Precedential or Non-Precedential: Precedential

Docket No. 00-4287

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Tse v. Ventana Med Sys Inc" (2002). *2002 Decisions*. Paper 388.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/388

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed July 11, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-4287 and 01-1066

ALEX TSE; MARGARET WAI LAM LEUNG;
MICHELLE LEUNG; CHING-SHUANG SHIH,
Appellants in No. 00-4287

v.

VENTANA MEDICAL SYSTEMS, INC., a
Delaware Corporation; JACK W. SCHULER;
JOHN PATIENCE; MARQUETTE VENTURE PARTNERS
L.P.; MARQUETTE VENTURE PARTNERS II, L.P.,
an Illinois Limited Partnership; MVP II
AFFILIATES, FUND, L.P. an Illinois Limited Partner ship

Ventana Medical Systems, Inc.; John Patience;
Jack W. Schuler, Appellants in No. 01-1066

On Appeal From the United States District Court
For the District of Delaware
(D.C. Civ. No. 97-cv-00037)
District Judge: Honorable Gregory M. Sleet

Argued: February 4, 2002

Before: BECKER, Chief Judge, McKEE, and
BARRY, Circuit Judges.

(Filed: July 11, 2002)

NANCY J. SENNETT, ESQUIRE
 (ARGUED)
Foley & Lardner
777 East Wisconsin Avenue
Milwaukee, WI 53202-5367

PATRICK J. KEARNEY, ESQUIRE
Foley & Lardner
3000 K Street, NW, Suite 500
Washington, D.C. 20007

JOEL E. FRIEDLANDER, ESQUIRE
Bouchard, Margules & Friedlander
222 Delaware Avenue, Suite 1102
Wilmington, DE 19801

Counsel for Appellants/Cross-
Appellees Alex Tse, Margaret Wai
Lam Leung, Michelle Leung and
Ching-Shuang Shih

STEVEN M. SCHATZ, ESQUIRE
  (ARGUED)
DAVID J. BERGER, ESQUIRE
ELIZABETH M. SAUNDERS,
 ESQUIRE
STEVEN GUGGENHEIM, ESQUIRE
Wilson, Sonsini, Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304

JESSE A. FINKELSTEIN, ESQUIRE
RAYMOND J. DiCAMILLO, ESQUIRE
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Counsel for Appellees/Cross-
Appellants Ventana Medical Systems,
Inc.; John Patience; Jack W. Schuler

2

OPINION OF THE COURT

BECKER, Chief Judge:

The plaintiffs, former shareholders of Biotek Solutions, Inc., ("Biotek"), appeal the District Court's order granting summary judgment for the defendants, Ventana Medical Systems, Inc. ("Ventana"), and Jack Schuler and John Patience, two of Ventana's officers, in this securities action brought pursuant to S 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. S 78j(b), S.E.C. Rule 10b-5, 17 C.F.R. S 240.10b-5, and California and North Carolina securities statutes. The plaintiffs' claims rest on the defendants' failure to disclose to Biotek's shareholders during negotiations that resulted in the merger of Ventana and Biotek the terms of a compensation package that Ventana had approved in principle for the two officer defendants. The District Court granted summary judgment for the defendants on the grounds that the plaintiffs had failed to demonstrate either causation or scienter. The Court granted summary judgment on the state law claims on the same grounds.

We will affirm the District Court's grant of summary judgment on the Rule 10b-5 claim because we agree that the plaintiffs have failed to adduce evidence establishing genuine issues of material fact on causation. The plaintiffs do not allege actual loss, but rather rely on a "lost opportunity" theory of causation. We have held that plaintiffs may rely on a "lost opportunity" theory only where the fact of loss is not wholly speculative, which we think it is in this case. We will also affirm the grant of summary judgment on the state law claim, albeit on a different ground from that relied upon by the District Court. In our view, California Corporate Code S 25401, the section under

which the plaintiffs challenge the defendants' alleged omission, does not cover "simple nondisclosure," or the mere nondisclosure of material facts. Rather, S 25401 covers only misstatements of material fact and those omissions that render misleading the statements that were made in connection with the sale or purchase of securities,

3

and the plaintiffs do not point to any such misstatements. Specifically, the plaintiffs contend that Ventana's disclosure of the stock that it was authorized to issue at the time when the Biotek shareholders voted to approve the merger was rendered misleading by the fact that Ventana had preliminarily approved the sale of shares to Schuler and Patience, but did not disclose that preliminary approval. We disagree, and therefore affirm the grant of summary judgment to the defendants on the California law claim.

I. Facts & Procedural History

A. Factual Background

The plaintiffs, Alex Tse, Margaret Wai Lam Leung, Michelle Leung, and Ching-Shuang Shih, were investors in Biotek, a closely held company that was in the business of developing, manufacturing, and marketing instruments used to diagnose cancer. Between 1992 and 1995 the plaintiffs made several investments in Biotek, which they describe as "promissory notes for their investment, along with stock in the form of an equity 'kicker.' " In total, the plaintiffs held approximately 9.12% of the notes and common stock issued by Biotek. Defendant Ventana Medical Systems, Inc. is a Delaware corporation headquartered in Tucson, Arizona. It engaged in roughly the same business as Biotek, and, until 1996 (when the two merged), was its principal competitor. Defendants Jack Schuler and John Patience were directors of Ventana during the period leading up to its merger with Biotek.

The parties present different pictures of the events that led to their merger. The plaintiffs portray Ventana as a company that badly needed to merge with Biotek in order to achieve its goal of going public. To support their portrayal of Ventana, the plaintiffs point to the statements that Ventana's investment banker, Bear Stearns, made to Ventana's Board regarding its potential purchase of Biotek that the "strategic, financial, and synergistic benefits [of the merger] are compelling" and that the "synergy value" of the merger with Biotek was between $32 and $50 million. The plaintiffs also cite statements that Patience made in a

4

presentation to the Ventana Board in November 1995 that Biotek "represents a very attractive strategic acquisition candidate for Ventana" and that the "acquisition will create significant value for Ventana's shareholders, even if a rich

premium is paid." Finally, the plaintiffs point to a statement from a memorandum written by a Ventana director that quoted Ventana's attorney as stating that "acquiring our major competitor is a truly significant event which in itself will make the public offering [of Ventana] possible."

In contrast, the defendants portray Biotek as a company on the verge of bankruptcy which, but for its 1996 merger with Ventana, would not have been able to pay its debts. The defendants assert that "[b]y 1995, Biotek's debts were overwhelming," pointing to a March 9, 1995 statement made by Biotek's then-president Michael Miller that Biotek "will be out of cash on or before June 30."

The defendants also point to a previous failed sale agreement that Biotek entered into with a company named Shandon. In a message to Biotek's investors regarding that sale agreement, Biotek's chairman Mike Danzi urged the investors to approve the deal because, in his view, "funding to allow Biotek to remain independent [wa]s not readily available on acceptable terms, and . . . without funding or a sale there [wa]s significant risk of loss of[their] investment." The Biotek investors approved the terms of the sale, but Shandon backed out of the deal. Finally, the defendants offer Danzi's deposition testimony that in 1995 Biotek "did not have the capacity to repay [its] debts as they were coming due," and that the company had "explored many opportunities for an equity or debt infusion," including "bankruptcy . . . as a way to protect [it] from the[ ] judgments, lawsuits, and . . . the significant debts coming due." The plaintiffs do not counter these descriptions.

Ventana and Biotek began negotiating the terms of a potential merger in the fall of 1994. According to the deposition testimony of Patience, who was involved in negotiating the merger, Biotek proposed merger terms under which its shareholders would own 50% of the successor company, and later, in early 1995, revised its

5

request downward, proposing that Biotek shareholders would own 33% of the new company. Ventana rejected both proposals. However, on December 19, 1995, Biotek and Ventana agreed upon and signed a letter of intent setting forth the terms of a merger plan.

The plan provided that a wholly-owned subsidiary of Ventana called Ventana Acquisitions Corporation would merge into Biotek, leaving Biotek as the successor corporation, which would then become a wholly-owned subsidiary of Ventana. The plan provided that Biotek's noteholders would exchange their notes for promissory notes issued by Ventana, known as "Ventana Exchange Notes," which would be senior for bankruptcy purposes to all of Ventana's preferred and common stock. The plan also provided that Biotek's noteholders would have the option to

convert all of their Ventana Exchange Notes into Ventana common stock at $5.00 per share. Unless holders of the Ventana Exchange Notes opted not to convert any of their notes into common stock, 50% of their notes would automatically be converted at the rate of $5.00 per share. All of the plaintiffs but one, Shih, opted not to convert any of their Ventana Exchange Notes. Shih did nothing, and due to her decision not to opt out of the automatic conversion provision, 50% of her notes were converted at the rate of $5.00 per share. All of the plaintiffs' non-converted notes have been repaid in full.

On January 16, 1995, three days before the merger agreements were signed, the Ventana Board approved in principle a compensation package for Schuler and Patience, the two Ventana directors who were taking the lead in negotiating the Biotek merger. On February 23, 1996, the Ventana Board gave its final approval to the compensation package, which provided that Ventana would issue to Schuler and Patience 1.75 million shares of Ventana Common Stock at $.60 a share. At the January 16 meeting, the Board recorded its determination that $.60 per share was the fair market value of Ventana's stock at that time. This issuance of stock to Patience and Schuler was, however, subject to a buyback provision until several conditions were met. These included that Patience and Schuler were required to: (1) "[s]pend 50% of their time

working exclusively for Ventana over a period of years;" (2) "complete the merger between Biotek and Ventana and integrate the two companies;" and (3) "[i]nsure that if Ventana sold its stock in a public offering, that the price of the stock would be at $4.00 per share or above."

In addition, Schuler was required to serve as Ventana's chairman for four years, and Schuler and Patience were required to invest $1,000,000 in Ventana, for which they were to receive convertible bonds on the same terms as other Ventana investors. The compensation agreement provided that if these conditions were not met, Ventana could repurchase the shares at the price at which they had initially sold them to Patience and Schuler. Thus, the compensation package was structured as an incentive system, i.e., if Patience and Schuler could increase the value of the company by the specified amount, the Board would compensate them by selling them a large number of Ventana shares at what it estimated to be the current (comparatively low) value of Ventana stock. In this respect, the compensation package was not unlike the strategy that boards of directors commonly employ when granting corporate officers options to buy company stock in the future at a discounted price in order to provide them with an incentive to increase the stock's value.

As noted above, the disclosures that Ventana made (and allegedly failed to make) to Biotek regarding the stock issuances that it had authorized at the time of the proposed

merger with Biotek is of particular relevance to the plaintiffs' claim under California Corporate CodeS 25401. On February 8, 1996, Biotek's Board of Directors sent a proxy letter to all Biotek investors (including holders of both notes and stock), requesting their approval of the planned merger with Ventana and explaining the terms of the proposed merger. An information sheet was enclosed with the letter, which included as one of its exhibits the Agreement and Plan of Reorganization ("the Agreement"). Section 4.5 of the Agreement set forth the "authorized capital stock of Ventana as of the date hereof " and stated that Ventana had 2,110,789 shares of common stock and 70,089 shares of preferred stock "reserved for issuance . . . under its stock option and stock purchase plans." Section

4.5 also stated that "[p]rior to the Closing Date [of the merger with Biotek,] Ventana expects that its authorized number of shares of Common Stock, Preferred Stock and Series D Preferred Stock will increase due to the proposed issuance of warrants to purchase an aggregate of 1,860,500 shares of Series D" Preferred Stock in connection with a proposed financing transaction.

Section 4.7 of the Agreement provided:

> No representation or warranty made by Ventana in this Article IV or in any other Article or Section of this Agreement, or in any certificate, schedule, or other document furnished or required to be furnished by Ventana pursuant hereto, contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make the statements or facts contained herein or therein not misleading in light of the circumstances under which they are made.

Section 6.3(a) of the Agreement provided that:

> The representations and warranties of Ventana and Sub [the subsidiary of Ventana that was merging into Biotek] set forth in Article IV of this Agreement shall be true and correct in all material respects on and as of the date of this Agreement and as of the Effective Time (except to the extent such representations and warranties speak only as of an earlier date, including, without limitation, Ventana's representations as to outstanding capitalization), and the covenants and agreements of Ventana and Sub set forth herein shall have been complied with in all material respects and Bio[t]ek shall have received a certificate signed by an authorized officer of Ventana and Sub dated the Effective Time to such effect.

None of the information concerning the Schuler and Patience compensation package that had been approved in principle on January 16 (but not yet formally approved until February 23) was disclosed to Biotek investors in

this information packet. However, Ventana disclosed the
information regarding the compensation package to its own
shareholders in a proxy statement issued on February 2,

1996 in anticipation of its upcoming annual shareholders
meeting.

The Merger Agreement required that 90% of the
outstanding Biotek stock had to vote in favor of the merger
in order for it to be approved. Although the plaintiffs state
that they were reluctant to accept the terms of the merger
because they received no cash for their Biotek stock and
promissory notes, all of them voted for the merger. The
merger plan was formally approved on February 23, 1996,
and became effective on February 26, 1996.

B. Procedural History

When the plaintiffs learned about the Patience and
Schuler compensation package, they sued Ventana,
Schuler, and Patience in the District Court for the District
of Delaware, alleging violations of S 10(b) of the Securities
Exchange Act of 1934, 15 U.S.C. S 78j(b), S.E.C. Rule 10b-
5, 17 C.F.R. S 240.10b-5, and California and North Carolina
securities statutes.1 The complaint alleges that Ventana
had fraudulently withheld information regarding the
Patience and Schuler compensation packages, and that
Ventana had failed to disclose the $.60 fair market value
estimate for Ventana shares at which Patience and Schuler
would be allowed to purchase Ventana shares after the
Biotek merger. The complaint further alleges that Ventana's
failure to disclose this information induced the plaintiffs to
accept the merger at terms much less favorable to Biotek's
investors than they could have negotiated had the terms of
the compensation package been disclosed.

The defendants moved to dismiss pursuant to Federal
Rule of Civil Procedure 12(b)(6), arguing that their duty to
disclose information did not extend to the plaintiffs. The
District Court rejected this argument and denied the
motion, concluding that:

> Defendants argue that where the acquirer was neither
> an insider nor a fiduciary of the target, the acquirer

---

1. The plaintiffs do not appeal the District Court's grant of summary
judgment on the claims based on North Carolina law. Those claims are
therefore not before us.

> owes no duty to disclose to the shareholders of the
> target. Although such . . . [an] assertion may be true,
> it is not relevant under the circumstances of the case
> at bar. In the instant action, the acquiring corporation

traded in its own securities. By the terms of the
Agreement, defendants were asking to become equity
shareholders in the acquiring corporation, Ventana.
Accordingly, as "insiders," defendants assumed an
affirmative duty to disclose material information.

The case was subsequently reassigned to a different judge.
Following discovery, the defendants moved for summary
judgment. Relying on the law-of-the-case doctrine, the
second District Judge (1) followed the first judge's
conclusion that the defendants owed a fiduciary duty to the
plaintiffs, and (2) concluded that the alleged omission was
material. Nevertheless, the Court granted summary
judgment on the two alternative grounds that no
reasonable jury could find either that: (1) the plaintiffs had
established loss causation; or that (2) the plaintiffs had
established scienter. For the same reasons, the District
Court concluded that the defendants were also entitled to
summary judgment on their state law claims.

The plaintiffs appeal, contending that the existence of
genuine issues of material fact rendered it error for the
District Court to grant summary judgment on either of the
alternative grounds on which it relied with regard to its
claims based on S 10(b), Rule 10b-5, and California law.
The defendants cross-appeal. They argue that the first
District Judge committed legal error when denying the
motion to dismiss by holding that the defendants had a
duty to disclose information to the plaintiffs regarding the
compensation package. And they submit that the second
District Judge erred by holding that he was bound by this
interpretation under the law-of-the-case doctrine. Although
the scope of the duty presents an important legal question,
we need not resolve it in order to decide this appeal.

The District Court had jurisdiction pursuant to 28 U.S.C.
S 1331 and 15 U.S.C. S 78aa. It exercised pendent
jurisdiction over the plaintiffs' related state law claims
pursuant to 28 U.S.C. S 1367(a) (which were also supported
by diversity jurisdiction, 28 U.S.C. S 1332). This court has

10

appellate jurisdiction to review the final order of the District
Court pursuant to 28 U.S.C. S 1291. We exercise plenary
review over the District Court's grant of summary
judgment, applying the same standards that the District
Court should have applied in the first instance. Chisolm v.
McManimon, 275 F.3d 315, 321 (3d Cir. 2001). Summary
judgment is proper if there is no genuine issue of material
fact and if, viewing the facts in the light most favorable to
the non-moving party, the moving party is entitled to
judgment as a matter of law. See Fed. R. Civ. P. 56(c);
Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The judge's
function at the summary judgment stage is not to weigh the
evidence and determine the truth of the matter, but to
determine whether there is a genuine issue for trial. See
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

II. The S 10(b)/Rule 10b-5 Claim

Section 10(b) of the Securities Act of 1934 makes it unlawful to "use or employ, in connection with the purchase or sale of any security, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. S 78j(b). Rule 10b-5, which the Securities and Exchange Commission promulgated pursuant to S 10(b), makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. S 240.10b-5. We have held that in order to prevail on a claim for securities fraud underS 10(b) and Rule 10b-5, "a plaintiff must show that the defendant (1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff 's reliance was the proximate cause of his or her injury." In re Ikon Office Solutions, Inc. Secs. Litig., 277 F.3d 658, 666 (3d Cir. 2002).

The District Court concluded that the defendants were entitled to summary judgment because there is no triable issue of fact on the causation or scienter requirements. If it

11

was correct with respect to either ground, the defendants are entitled to summary judgment on the S 10(b) and Rule 10b-5 claims. We turn first to the causation issue.

A. Causation

The causation element of our test for securities fraud under S 10(b) and Rule 10b-5 turns on a legal link between the defendants' misstatement or omission and the plaintiffs' injury. Typically, this requires the plaintiff to show that he or she experienced an actual loss. The plaintiffs in this case did not experience any actual loss from their initial investments in Biotek. The three plaintiffs who declined to convert their Ventana Exchange Notes to Ventana common stock were repaid in full, with the interest they had negotiated. Shih, the plaintiff who converted half of her Ventana Exchange Notes into stock, had, as of the time the briefs were filed for this appeal, experienced a significant increase in the value of her shares above the rate at which she exercised her option to convert her notes into common stock.

We have, however, recognized, at least in the context of claims brought pursuant to S 14(a) of the Securities Act of 1934 and Rule 14a-9 promulgated thereunder (which apply to statements made in proxy materials, see infra note 2), that plaintiffs may proceed on a theory of "lost opportunity" without demonstrating any actual loss. See Gould v. American-Hawaiian S.S. Co., 535 F.2d 761, 781 (3d Cir.

1976). The District Judge who heard the motion to dismiss assumed that this "lost opportunity" theory extends to Rule 10b-5 claims, and held that the plaintiffs had pleaded facts sufficient to support the causation element of their claim based on the lost opportunity to negotiate a merger with Ventana on more favorable terms. She observed that Gould allowed the plaintiffs to proceed on the theory that "by the circulation of defective proxy materials 'plaintiffs were lulled to inaction and thereby suffered the loss of an opportunity to secure a merger agreement which would be more favorable to them.' " (quoting Gould, 535 F.2d at 782.). She then held that because the Ventana/Biotek merger agreement "required a 90% affirmative vote of the outstanding Biotek Notes in order to consummate the

12

merger," and because "[p]laintiffs owned approximately 9.12% of all the outstanding Biotek Notes," and thus the "plaintiffs were in a relatively strong bargaining position," she could not "conclude, based upon the pleadings, that had plaintiffs not been 'lulled into inaction' by defendants' alleged omissions/misrepresentations, they would not have successfully prevailed upon Ventana to pay a higher price for Biotek."

As explained above, the case was reassigned to a different judge following the denial of the motion to dismiss. That judge accepted the first judge's conclusion that Gould provides that plaintiffs may, under some circumstances, establish causation for a 10b-5 claim through a "lost opportunity" theory, but nevertheless concluded that the defendants were entitled to summary judgment on the causation issue. In its opinion granting summary judgment, the District Court noted that "[u]nder Gould . . . , a plaintiff who cannot prove out of pocket damages may prove 'loss of a possible profit or benefit, [defined as] an addition to the value of one's investment, unless the loss is wholly speculative.' " (citing Gould, 535 F.2d at 781). The Court observed that "the plaintiffs want the court to hypothesize as to whether" they could have negotiated a more favorable conversion rate from Ventana "and to hypothesize as to what that rate would be." It concluded that this need for speculation by the Court renders the plaintiffs' "claim for lost profits . . . wholly speculative." From this, the Court reasoned that the plaintiffs' claim of lost opportunity to negotiate better merger terms was "wholly speculative," and that they therefore could not rely on Gould's "lost opportunity" theory. Because the plaintiffs did not experience any out-of-pocket losses (the other route for showing the loss needed to establish causation), the Court held that they had no avenue for demonstrating loss causation, and that therefore the defendants were entitled to summary judgment.

Gould was a class action lawsuit brought by shareholders of McLean Industries against that company's directors alleging, inter alia, that the directors had violated § 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder "in

connection with the solicitation of proxies by McLean

Industries for shareholders' approval of its merger into Reynolds" Tobacco Company.2Gould, 535 F.2d at 765. The Gould plaintiffs' claims were based on the directors' failure to disclose in their proxy solicitation (which was requesting approval of the terms of the merger) that certain shareholders of McLean would be receiving a more favorable exchange rate than other McLean shareholders. The plaintiffs in Gould stipulated that they did not experience any out-of-pocket loss in the merger transaction but they claimed that had they known about the more favorable terms of exchange that some of their fellow shareholders were getting, they would have negotiated to receive an equal share of the surplus value that these shareholders were receiving. Id. at 781.

Gould held that while the damages provision of the 1934 Act provides that "no person permitted to maintain a suit for damages under the provisions of this title shall recover . . . a total amount in excess of his actual damages," the "dichotomy [that this provision draws upon] is between actual and punitive damages and recovery is not limited to out of pocket loss, a diminution in the value of one's investment, but may include loss of a possible profit or benefit, an addition to the value of one's investment, unless the loss is wholly speculative." Id. (emphasis added). Gould further held that "by the circulation to [the plaintiffs] of the defective proxy materials [they] were lulled to inaction and thereby suffered the loss of an opportunity to attempt to secure a merger agreement which would be more favorable to them." Id. at 782. Thus, the court agreed that the fact of the loss was not wholly speculative (i.e., it was fairly certain that the plaintiffs suffered a monetary loss of some amount). While the court focused on the difficulty of

---

2. Parallel to S 10(b) and Rule 10b-5,S 14(a) and Rule 14a-9 prohibit the issuance of a proxy statement "containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." 17 C.F.R. S 240.14a-9(a).

determining the amount of the loss, it nevertheless held that where the fact of the loss is almost certain,"the risk of uncertainty as to amount of damages is cast on the wrongdoer and it is the duty of the fact finder to determine the amount of the damages as best he can from all the evidence in the case." Id.

In sum, Gould holds that: (1) "lost opportunity" damages are available "unless the loss is wholly speculative"; and (2) if the fact of loss is not "wholly speculative," "the risk of uncertainty as to amount of damages is cast on the wrongdoer and it is the duty of the fact finder to determine the amount of the damages as best he can from all the evidence in the case." 535 F.2d at 781-82. Thus, "lost opportunity" damages are not available where the fact of the loss, i.e., whether there was any lost opportunity at all, is wholly speculative. But where the fact of lost opportunity is well established, it is up to the fact finder to determine the amount of the loss to the best of its ability. The defendants argue, however, that Gould's "lost opportunity" approach is inapplicable to the present case because "Gould is a Section 14(a) case that does not even discuss the causation requirement in the context of Rule 10b-5," and its "lost opportunity" theory does not extend to Rule 10b-5 claims.3 We will assume without deciding that Gould's "lost opportunity" theory applies to Rule 10b-5 claims. Even assuming that it does, however, we do not think that the plaintiffs may proceed under that theory in this case because the fact of their loss is "wholly speculative." Gould, 535 F.2d at 781.

_____

3. Although we have not applied Gould's "lost opportunity" causation theory to a Rule 10b-5 case, district courts from within this Circuit have done so. See Dofflemeyer v. W.F. Hall Printing Co., 558 F. Supp. 372, 380 n.6 (D. Del. 1983); see also Rudinger v. Ins. Data Proc., Inc., 778 F. Supp. 1334, 1340 n.9 (E.D. Pa. 1991). Furthermore, the Supreme Court has imported standards from S 14(a) jurisprudence into its S 10(b) jurisprudence in other contexts, such as the test for materiality. See Basic Inc. v. Levinson, 485 U.S. 224, 232 (1988) (adopting in the context of S 10(b) the materiality test set forth in TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1976), a S 14(a) case); but see Herskowitz v. Nutri/System, 857 F.2d 179, 189-90 (3d Cir. 1988) (noting that the mental state required for a S 14(a) violation is only "negligence," and is thus less stringent than the scienter requirement in a S 10(b) case).

The plaintiffs' main contention is that, if they had known the details of the compensation package that the Ventana Board had approved in principle, including its judgment that the $.60 per share figure was the stock's "fair value," they would have held out for a better exchange rate between Biotek stock and Ventana stock in the merger deal. As the defendants properly note, there are at least four events upon which the plaintiffs' alleged lost opportunity would hinge. First, the plaintiffs would have had to vote against the proposed merger, and recruit at least some other shareholders to oppose it with them (they held 9.12% of the shares and would need 10% to prevent the merger). Second, Biotek would have had to negotiate a more favorable exchange rate at which its shareholders could exchange Ventana Exchange Notes for Ventana common stock. Third, the plaintiffs would have to have chosen to exchange their notes for common stock. Fourth, the plaintiffs would have to have chosen to have sold

Ventana common stock following the IPO at a profit (i.e., in order to do better than the return that they got on their promissory notes). We will assume that the plaintiffs would have completed the third and fourth steps of the chain (exercising their conversion option and selling their stock at a profit). Nevertheless, we think that the Gould "wholly speculative" standard is not met by the first and second steps taken together (rejecting Ventana's merger offer and negotiating a better deal).

Regarding the first step in this chain, the plaintiffs argue that because they held almost 10% of the shares, the amount required to block the merger, they could have obtained the necessary additional votes and would have voted against the merger and negotiated more favorable terms for Biotek had they known about the Patience/Schuler compensation package. To support this contention, they present affidavits and testimony stating that they themselves would have voted against the merger if the information had been disclosed. They also present affidavits from three out of the five Biotek directors who voted in favor of the merger representing that they would have voted against the merger had the information been disclosed. We will assume that the plaintiffs could have amassed sufficient votes to block the merger, but we think

it is highly speculative that they would have done so had the Ventana Board disclosed the information regarding its estimate of the value of Ventana stock and the terms of the Patience and Schuler compensation packages.

The defendants point to evidence of significant financial difficulties that Biotek was facing at the time when the shareholders voted on the merger offer. Indeed, they adduce evidence that seems to demonstrate that "by October 1995, Biotek had no real alternative but bankruptcy." They cite a letter from Biotek's Chairman, Mike Danzi, to Biotek's shareholders urging them to accept a deal similar to the Ventana deal in August 1995, in which he wrote that "funding to allow Biotek to remain independent is not readily available on acceptable terms, and . . . without funding or sale there is a significant risk of loss of your investment." The defendants also point to the testimony of Danzi in which he stated that in October 1995, Biotek was forced to have an outside investor cover its payroll expenses. The defendants argue that these record references show that the only two options were for the Biotek shareholders to accept the merger, in which case they were likely to have their notes repaid in full, or for Biotek to declare bankruptcy, in which case the plaintiffs would almost certainly have received a less than full return on their promissory notes.

The plaintiffs dispute that Biotek would have been required to declare bankruptcy, relying principally upon an affidavit from Angella Sabella, a former Biotek investor, that states that she would have loaned up to $2.8 million to

Biotek in order to prevent it from going bankrupt. Such post hoc declarations are inevitably suspect. Moreover, Sabella would have extended the loan only on a "super priority" basis, meaning that her loan would line up before the plaintiffs' notes in the case of bankruptcy, an arrangement that would have been extremely difficult to obtain. In sum, while the plaintiffs have presented substantial evidence that they could have rejected the Ventana merger on the terms on which it ultimately took place, we believe that it is highly speculative that they would have done so, even if they had known the terms of the compensation package, given Biotek's shaky financial

17

situation and the risk of loss of their investment in the case of bankruptcy.

Regarding the second event, even if we were certain that the plaintiffs would have voted against the merger if the compensation information had been disclosed, the record renders it unlikely that they could have negotiated a better deal. Indeed, there is evidence in the record that prior to the final merger proposal, Biotek had attempted to negotiate a better exchange rate between Biotek and Ventana shares, but had been refused. In the fall of 1994, Biotek proposed a merger where its shareholders would hold 50% of the shares in the merged company, but Ventana rejected the offer. And in early 1995, Biotek proposed a merger arrangement where its shareholders would hold 33% of the merged company but Ventana declined.

The plaintiffs point to information obtained through discovery about the importance of the Biotek merger to Ventana, including how crucial the merger was for Ventana to shore up its market position and to prepare for an IPO. The plaintiffs rely on the following information. First, Biotek relies on a presentation that Patience made to the Ventana Board in November 1995 regarding the potential Biotek merger, in which he recommended that Ventana acquire Biotek because:

>     1. [Biotek] represents a very attractive strategic acquisition candidate for Ventana; and

>     2. The acquisition will create significant value for Ventana's shareholders, even if a rich premium is paid.

To determine how rich of a premium that Ventana might have paid, the plaintiffs invoke a November 30, 1995 recommendation that Ventana management made to the Board "that it approve discussions for the acquisition of Biotek on terms not to exceed $27.2 million" in stock and assumed liabilities.

The plaintiffs also cite presentations delivered to Ventana by Bear Sterns in February 1995 that concluded that:

1. The acquisition of Biotek by Ventana was "of critical strategic importance as Ventana embarks on its strategy of automating IHC testing in laboratories";

18

2. The "synergy value" of the Merger was between $32 million to $50 million; and

3. The "strategic, financial and synergistic benefits of " the Merger "are compelling."

This information, the plaintiffs submit, shows not only that Biotek could have negotiated a more favorable merger deal from Ventana, but also establishes the bounds of how much more Ventana would have been willing to pay (for the purposes of damage calculations).

We disagree. The plaintiffs would have the court reconstruct the negotiations as if Biotek had perfect information about Ventana's underlying financial situation and how much Ventana valued Biotek and Ventana had no information regarding Biotek's finances or how much it valued the Ventana merger. This is a highly unrealistic way to recreate a potential merger negotiation. Even if the plaintiffs had all of the information regarding the compensation package that they allege they should have been given, they still would not have known any of the information about the rate at which Ventana valued Biotek that they now cite as evidence for the proposition that they would have secured more favorable merger terms. This evidence is especially unconvincing in light of the evidence that Biotek attempted to secure a more favorable share exchange rate and failed to do so.

The highly speculative chain of events that the plaintiffs ask us to infer from the evidence they have presented -- in particular, that Biotek would have rejected the Ventana offer and could have negotiated a more favorable merger deal -- appears to be what Gould was referring to when it stated that we should not apply the "lost opportunity" theory of causation in a situation where the loss is "wholly speculative." Gould, 535 F.2d at 781. We think that unlike Gould, where the fact of some uncertain amount of loss was clearly established because some shareholders received a more favorable share exchange rate than other similarly place shareholders, the very fact of loss in this case is "wholly speculative."[4]

---

4. The fact of loss was also much more certain in Rudinger v. Ins. Data Proc., Inc., 778 F. Supp. 1334 (E.D. Pa. 1991), in which the court allowed

19

The plaintiffs also make the alternative argument that damages could be calculated based on a disgorgement theory, that is, damages could be calculated by requiring

Patience and Schuler to disgorge the profits they have received from their compensation package. We fail to see how this argument makes any less speculative the fact of loss. We will therefore affirm the District Court's grant of summary judgment on the plaintiffs' claims based on S 10(b) and Rule 10b-5 on the ground that no reasonable jury could find that the plaintiffs have established causation.[5] As there is no triable issue of fact with respect to the causation element of the plaintiffs' 10b-5 claim, we need not reach the issue of scienter. Our ruling moots the defendants' cross-appeal, which addresses only theS 10(b) and Rule 10b-5 claims.

III. The California Corporate Code S 25401 Claim

The plaintiffs also brought claims based on S 25401 of the California Corporations Code, which provides that:

> It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the

_____

the plaintiff to rely on the "lost opportunity" theory of causation, than it is in the present case. Rudinger involved a claim by an employee who chose to work for a company because he was enticed by the promise of stock options based on a fraudulently over-valued stock. In doing so, the employee gave up a definite offer from another employer that also included stock options (that were not fraudulently represented). The district court held that the fact of loss was not"wholly speculative" because, presented with accurate information, the employee would have chosen the other job. Further, the district court noted that the "lost opportunity" damages could be quantified because the alternative job offer presented "certain, fixed, and demonstrable profits thwarted by a defendant's alleged fraud." Rudinger, 778 F. Supp. at 1341.

5. The plaintiffs did not experience any out-of-pocket loss, and the fact of their potential loss is too speculative to support the "lost opportunity" theory of causation.

20

> circumstances under which they were made, not misleading.

Cal. Corp. Code S 25401. Specifically, the plaintiffs claim that Ventana's disclosures regarding the stock issuances that it had approved at the time when the Biotek shareholders voted to approve the merger were rendered misleading by the fact that Ventana had preliminarily approved the sale of shares to Schuler and Patience, but did not disclose that preliminary approval. In other words, the plaintiffs contend that the planned sale of stock to Patience and Schuler was "a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not

misleading." Cal. Corp. Code S 25401.

The District Court granted summary judgment for the defendants on the California law claim because it found that "it involves the same elements as the plaintiffs' 10b-5 claim." While we think that the District Court was incorrect in its conclusion that S 25401 involves the same elements as a Rule 10b-5 claim, we are satisfied that it was correct that the defendants are entitled to summary judgment on the California claim, albeit for somewhat different reasons than those relied on by the Court. See Narin v. Lower Merion Sch. Dist., 206 F.3d 323, 333 n.8 (3d Cir. 2000) ("An appellate court may affirm a decision on a ground other than that relied on by the district court.").

The District Court did not provide a separate discussion of the claims based on California law, but granted summary judgment for the defendants with respect to all claims because it concluded that S 25401 "involves the same elements as the plaintiffs' 10b-5 securities fraud claim." Therefore, we assume that the District Court relied on the same grounds, i.e. failure to adduce facts sufficient to establish both causation and scienter, to dismiss the California claims as it did to dismiss the Rule 10b-5 claims. To the extent that it relied on causation and scienter to grant summary judgment to the defendants on the California claim, the Court erred. Section 25401, which is modeled on S 12(2) of the Securities Act of 1933, has less stringent requirements than S 10(b) and Rule 10b-5 regarding both scienter and causation. Section 25401 does

21

not require civil plaintiffs to demonstrate the exacting scienter standard required for 10b-5 claims. Nor does it require plaintiffs in the civil context to establish causation. See Bowden v. Robinson, 136 Cal. Rptr. 871, 878 (Cal Ct. App. 1977) (noting that in a claim brought underS 25401 "(1) proof of reliance is not required, (2) although the fact misrepresented must be 'material,' no proof of causation is required, and (3) plaintiff need not plead defendant's negligence"). But cf. People v. Simon, 886 P.2d 1271, 1290-01 (Cal. 1995) (imposing a "knowledge" mens rea requirement for criminal prosecutions brought under California Corporate Code S 25401).

Nevertheless, the defendants are entitled to summary judgment on the S 25401 claim because that statute does not cover the activity alleged by the plaintiffs in this case. As noted above, S 25401 attaches liability to the buyer or seller of a security when he or she makes "an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Cal. Corp. Code S 25401. The California Court of Appeals has held that the statute does not cover cases of "simple nondisclosure." Lynch v. Cook, 196 Cal. Rptr. 544, 554 (Cal. Ct. App. 1983) (quoting Bowden v. Robinson, 136 Cal. Rptr. 871 (Cal. Ct. App. 1977)); see also 1 Harold

Marsh, Jr. & Robert H. Volk, Practice Under the California Securities Laws S 14.03[2][a] (2001) (stating that S 25401 does not cover cases of "simple" or "total" nondisclosure). We interpret this to mean that S 25401 does not impose a duty on buyers or sellers to disclose information unless that information is material and "necessary in order to make [other] statements made, in light of the circumstances under which they were made, not misleading." Cal. Corp. Code S 25401.

The plaintiffs contend that the representations that Ventana made about its capital structure, including its outstanding stock, were misleading when not accompanied by the disclosure of information regarding the Patience and Schuler compensation package.[6] Thus, the question is

_____

6. The plaintiffs failed to raise in their opening brief, but argue in their reply brief, that because they included in their amended complaint

whether the plaintiffs had to disclose the share issuance aspect of the compensation package in order to make the statement that they made at the time of the merger about their outstanding capital stock not misleading. The plaintiffs point to statements from the Reorganization Agreement (which contained the terms negotiated between Ventana and Biotek), and from the Information Statement, which was an additional document distributed to Biotek investors prior to their approval of the merger that basically summarized the Reorganization Agreement.

The Reorganization Agreement provided a detailed account of Ventana's capitalization structure. It stated:

> Section 4.5  Capitalization The authorized capital stock of Ventana as of the date hereof consists of 30,000,000 shares of Common Stock and 18,450,000 shares of Preferred Stock, 750,000 share of which have been designated Series A Preferred Stock, 8,300,000 shares of which have been designated Series C Preferred Stock and 9,400,000 shares of which have been designated Series D Preferred Stock. As of the date hereof, 2,742,968 shares of Common Stock, 750,000 shares of Series A Preferred Stock, 3,083,039 shares of Series C Preferred Stock and 9,036,410 shares of Series D Preferred Stock are outstanding, and no other shares of capital stock are outstanding. Ventana has outstanding warrants to purchase an aggregate of 228,914 shares of Preferred Stock and has 2,110,789 shares of Common Stock and 70,089 shares of Preferred Stock reserved for issuance (including both shares subject to outstanding options or rights and shares reserved for future grant) under its stock option

_____

claims under California Corporate Code S 25402, which proscribes insider trading, and because, according to the plaintiffs, S 25402 does

cover "simple nondisclosure," that the defendants are not entitled to summary judgment even if the plaintiffs' claim is only one of "simple nondisclosure." Our jurisprudence makes clear that "an issue is waived unless a party raises it in its opening brief." Reform Party of Allegheny County v. Allegheny County Dep't of Elections, 174 F.3d 305, 316, n.11 (3d Cir. 1999) (citation omitted). The plaintiffs failed to raise a claim based on S 25402 in their opening belief and therefore may not rely on it now.

> or stock purchase plans. Shares of Common Stock issuable upon conversion of Ventana Payment Notes will, when issued upon any such conversion, be duly and validly issued, fully paid and nonassessable. Prior to the Closing Date, Ventana expects that its authorized number of shares of Common Stock, Preferred Stock and Series D Preferred Stock will increase due to the proposed issuance of warrants to purchase an aggregate of 1,860,500 shares of Series D Preferred Stock in connection with a proposed financing transaction. Ventana will on the Closing Date deliver an updated capitalization schedule as of that date.

The plaintiffs focus on the penultimate sentence in this section, which we have emphasized. They argue that because the Reorganization Agreement disclosed the issuance of 1,860,500 shares connected to the financing of the merger that Ventana expected to issue prior to the closing date, but did not refer to the planned sale of 1.5 to 1.75 million shares of Ventana common stock to Patience and Schuler, that the omission of any reference to the compensation package makes the statement quoted above misleading. The defendants counter that the Reorganization Agreement only made representations about the stock that Ventana expected to issue "prior to the Closing Date." They contend that "[i]t is undisputed that the Compensation Package shares were not issued or outstanding until April 19, 1996, at the earliest," and that "[i]t is equally undisputed that the historical information in the Reorganization Agreement was correct."

In our view, whether the statement quoted above is misleading in the absence of information regarding the compensation package depends largely on the timing of events, specifically, when the Ventana Board of Directors had given final approval to the compensation package relative to the closing date of the Ventana/Biotek merger. The relevant events are as follows. In November 1995, the Ventana Board began to negotiate a compensation package with Schuler and Patience. Thereafter, several relevant events happened at the January 16, 1996 meeting of the Ventana Board of Directors. First, the Ventana Board voted to authorize Ventana "to issue and sell an aggregate of

1,500,000 shares of the Corporation's Common Stock to

Jack Schuler and Crabtree Partners at $.60 per share" subject to certain conditions.7 The Board also voted to authorize the officers to increase the number of shares to be sold to Patience and Schuler to 1.75 million if needed. The Board also approved on January 16, 1996 the valuation of the company's common stock at $.60. The Ventana Board of Directors did not consider its January 16 vote to grant final approval for the compensation package, however, because, as noted below, it submitted the issue to the Ventana shareholders for approval in a proxy vote.

The Ventana Board also approved two resolutions regarding the Biotek merger in its January 16 meeting. First, the Ventana Board signed a letter of intent to merge with Biotek. Second, the Ventana Board approved the issuance of the shares discussed in the sentence highlighted from Section 4.5 of the Reorganization Agreement, quoted above, to help finance the planned merger with Biotek. The Ventana Board issued the Reorganization Agreement and Information statement on January 19, 1996.

On February 2, 1996, the Ventana Board disclosed the terms of the Patience/Schuler compensation plan in a proxy statement issued to its shareholders, and the shareholders approved the plan. Danzi, the Biotek Chairman, wrote to Biotek investors on February 8, 1996, calling for a special meeting to vote on whether to approve the merger with Ventana. He enclosed in this letter copies of the Reorganization Agreement and Information Statement. The Ventana Board of Directors voted to approve the "final compensation plan for Mr. Schuler, Mr. Patience, and Crabtree Partners which included a right to purchase 1,750,000 shares of the Company's restricted Common Stock, subject to certain buyback provisions by the Company, at $.60 per share," on February 23, 1996. On the same day, more than 90% of Biotek investors, including all of the plaintiffs, voted to approve the merger with Ventana. As noted above, the merger transaction

---

7. Crabtree Partners is a venture capital firm that was initially a defendant in this case, but is no longer involved.

closed on February 26, 1996. Patience and Schuler bought the shares issued as part of the compensation package on April 19, 1996.

The plaintiffs emphasize the proximity of the Board's January 16 authorization of the compensation agreement and the representations made to Biotek (and through Biotek to its investors) in the Reorganization Agreement. They contend that because Ventana was clearly contemplating expanding its capital stock by issuing 1.75 million shares to Patience and Schuler, it was obligated to include that information in the Reorganization Agreement, and that its failure to do so renders the statements made

in the agreement about the currently outstanding capital stock misleading. The defendants counter, emphasizing that none of their statements in the Reorganization Agreement were false, and that the statements were only intended to apply to capital stock issuances that took place before the closing date for the merger. They point out that the final approval of the issuance of stock to Patience and Schuler took place after the Reorganization Agreement was distributed, and that Ventana did not issue the shares to Patience and Schuler until April 1996, almost two months after the closing date of the Ventana/Biotek merger.

The question whether Ventana "omit[ted] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" turns largely on how broadly we read the term "misleading." Cal. Corp. CodeS 25401. Although the California courts have provided no guidance on the breadth of the term "misleading" inS 25401, they have cautioned that S 25401 should not be read to create a general duty of disclosure of all material information, i.e. it does not cover "simple nondisclosure." Lynch v. Cook, 196 Cal. Rptr. 544, 554 (Cal. Ct. App. 1983) (quoting Bowden v. Robinson, 136 Cal. Rptr. 871 (Cal. Ct. App. 1977)); see also 1 Harold Marsh, Jr. & Robert H. Volk, Practice Under the California Securities Laws S 14.03[2][a] (2001) (stating that S 25401 does not cover cases of "simple" or "total" nondisclosure). That caution counsels us not to adopt a broad reading of the term "misleading" in this case.

26

Taking the facts in the light most favorable to the plaintiffs, do they have an actionable claim underS 25401? That question hinges on whether the statement from the Reorganization Agreement that, "Prior to the Closing Date, Ventana expects that its authorized number of shares of Common Stock, Preferred Stock and Series D Preferred Stock will increase due to the proposed issuance of warrants to purchase an aggregate of 1,860,500 shares of Series D Preferred Stock in connection with a proposed financing transaction," was misleading because it was not accompanied by information regarding the prospective issuance of shares to Patience and Schuler. We think that the omission did not render the statement misleading for a number of reasons.

First, the issuance of stock disclosed in the Reorganization Agreement (i.e., that relating to the financing of the merger) is sufficiently distinct from the issuance of stock pursuant to the compensation package that the omission of information regarding the second does not make the disclosure of information regarding the first misleading. The issuance of stock pursuant to the financing plan appears to have had final approval before the Ventana Board made its statement in the Reorganization Agreement, while the Patience/Schuler compensation package did not receive final approval until after the distribution of the Reorganization Agreement. The compensation agreement

went to the shareholders for approval through a proxy statement and was subject to another vote by the Board of Directors before its approval was deemed final.

Second, the Board contemplated issuing the stock for the financing plan before the closing date of the merger, but there is no indication that it contemplated issuing the stock for the Patience/Schuler compensation plan until after the merger's closing date. Indeed, the issuance was conditioned on the merger's success, and Ventana did not issue the stock to Patience and Schuler until April 19, 1996, about two months after the merger's closing date. As the defendants point out, the Reorganization Agreement only made statements with respect to Ventana's capitalization as of the date on which the Reorganization Agreement was issued and issuances of stock that it expected to happen prior to the closing date for the merger.

27

Finally, it is undisputed that the Ventana Board had the authority to issue additional common stock at any time it wanted to do so after the merger. We fear that if we concluded that the present case falls under S 25401, we would come close to creating a general duty to disclose all information that relates to any topic mentioned in a merger agreement.

Therefore, although we think that the District Court likely erred by granting summary judgment to the defendant on the claims based on California Corporate Code S 25401 based on scienter and causation grounds, we will affirm based on the alternative ground that the claims allege only "simple nondisclosure," which is not actionable under S 25401.

The judgment of the District Court will be affirmed.

A True Copy:
Teste:

     Clerk of the United States Court of Appeals
     for the Third Circuit

28